[No. 19581.  Department Two.  April 1, 1926.]

S. K. GUDMUNDSON *et al., Respondents,* v. COMMERCIAL BANK & TRUST COMPANY, *et al., Appellants.*[1]

[1] VENDOR AND PURCHASER (60, 73)—RESCISSION BY VENDEE—FRAUD—EVIDENCE—SUFFICIENCY. The evidence does not sustain findings of actionable fraudulent representations authorizing a rescission of a contract to purchase land, as a first-class commercial orchard with an abundance of water for irrigation of a certain acreage, where, by the weight of the evidence, they were justified by the facts or not contrary to what was seen by a personal inspection.

[2] BROKERS (37)—PRINCIPAL AND AGENT (56)—MISREPRESENTATIONS OF AGENT—LIABILITY OF PRINCIPAL. The vendor is not bound by, or liable for, false representations of a real estate broker, authorized only to find a purchaser and without power to make a binding contract of sale, made in showing the property, to the effect that it was a first class commercial orchard which would produce a certain sum per year and pay itself out.

[3] FRAUD (22)—VENDOR AND PURCHASER (73)—FRAUD—EVIDENCE—SUFFICIENCY. The uncorroborated testimony of the vendee as to fraudulent representations, contradicted by two witnesses, is not such clear and convincing evidence as is necessary to establish fraud.

[4] PLEADING (109)—AMENDMENT OF COMPLAINT—CONDITION OF CAUSE. A trial amendment of the complaint, offered as the court was about to rule on the merits, will be disregarded where it introduced a new theory, submitting a new issue which defendants were entitled to meet by other evidence.

[5] PLEADING (58)—AFFIRMATIVE DEFENSE—NATURE AND OFFICE—RELIEF. Matter pleaded as an affirmative defense and not as a counter claim, does not entitle defendants to affirmative relief, where judgment therefor is not asked.

[1]Reported in 244 Pac. 676.

Appeal from a judgment of the superior court for Chelan county, Grimshaw, J., entered December 24, 1924, upon findings in favor of the plaintiffs, in an action for the rescission of a contract, tried to the court. Reversed.

*O. P. Barrows,* for appellants.

*Chadwick, McMicken, Ramsey & Rupp,* and *Sumner & Adams,* for respondents.

TOLMAN, C. J.—Respondents, as plaintiffs, brought this action for rescission of a contract to purchase real estate and to recover damages, upon the theory that the contract had been procured by false and fraudulent representations upon which they relied. The cause was tried to the court, a reference was had for an accounting, and a judgment was entered, rescinding the contract and awarding a recovery against both defendants in the sum of $8,516.52, with interest and costs. From that judgment, the defendants have appealed.

The record is voluminous and greatly involved. Every issue was sharply contested, and the evidence so conflicting that anything like a comprehensive statement of the facts would occupy far too much space. We shall therefore give only such a brief and general outline as will afford an understanding of what is actually decided.

Respondent Gudmundson was born in Iceland, and had spent the greater part of his life at sea or in the Arctic regions. Happening, through an attempt to assist a friend, to secure title to a small tract of orchard land in what is known as Wenatchee Heights Orchard Tracts, he had some correspondence concerning it with Mr. L. H. Marcy. Visiting his tract in the late fall of 1919, he found Marcy the tenant of the appellant bank and in possession of the lands now in

question, which were closely adjacent to his own. He was greatly pleased with the location and general surroundings, as could hardly have been otherwise with a man of his previous experience, and talked with Marcy in regard to securing more land adjoining, expressing an intention or hope that he could sooner or later give up his arduous life in the north and settle down to a pleasant and peaceful existence on the site which so pleased him. Marcy gave him information as to the ownership of the tract he wished to acquire, and, acting thereon, he was soon in a fair way to acquire it. He returned to Wenatchee in January, 1920, for the purpose of closing the purchase of the tract, upon which he intended eventually to build his home; again saw Marcy, who asked him to purchase the bank's land, and proposed that he (Marcy) should become his tenant in that event and till and care for all of his holdings during the years that might intervene before he was ready to make his home there. Marcy showed him the bank's land, told him—so he says—that it consisted of twenty-eight acres of first-class commercial orchard in full bearing, which would produce a revenue of $5,000 per year; and, without knowing or naming any price, or suggesting terms, Marcy induced him to go to see appellant Shultz, the cashier of the bank, with a view to purchasing. Upon being introduced by Marcy to Mr. Shultz, a general conversation ensued regarding Alaska and the like, in which much of respondent Gudmundson's past experiences were revealed. Finally, Shultz asked the purpose of the visit, and Marcy said, in effect, that Gudmundson might purchase the bank's land. Gudmundson replied that he had no money with him to swing such a deal. The subject was pursued, however, and Gudmundson on the witness stand said:

"A.   Marcy stated again the production—the bargain of the land, what good quality it was, so I asked the question directly to both of them whether this land did produce $5,000 per year. Walter said that the books would show it. Mr. Marcy said that it did . . . after they had told me for a considerable length of time regards the valuation of the land, and so forth, and its production, then I told them that if they wanted to sign the land over to me that I would be willing to accept it under condition that it could pay itself out.

"Q.   What did he say to that?

"A.   Walter said that that was kind of gally to ask because he had men in the bank that he could sign that land over to if he wanted to and didn't need to have to sign it over to any stranger, but he says, 'We would like to work out a reasonable deal whereby you would buy that land.

"Q.   Did he represent to you at that time orchard conditions and money that was made in the apple business and all those things in the Wenatchee Valley?

"A.   He did.

"Q.   Did he give you literature to read?

"A.   What?

"Q.   Did he give you literature to read?

"A.   The paper at that time was laying on the desk.

"Q.   Did he show you that paper?

"A.   He did and told me to take it home with me.

.   .   .   .   .   .   .   .   .   .

"A.   Things had worked itself down to a basis where it looked like that it was impossible for them to make any deal with me on account that I didn't have the money to swing it when Mr. Shultz came out flat footed and said to me, 'How much money have you got?' I told him that I had $150 in my pocket. 'Well, now,' he says, 'let us work out a solution whereby that we can make a deal. Have you got any other money in Seattle or anywhere else?' I told him that I had about $800 in Liberty bonds laying in Seattle, that I had about $500 in war savings stamps which were registered in Nome, Alaska, and could only be cashed in Nome, Alaska; outside of that I had no negotiable papers or money.

"Q. What did he say about that?

"A. He says, 'Let me offer a suggestion.' So he made a suggestion that I was to pay him as much as I could of this $150 down; say one hundred and thirty, that I didn't need to go back to Seattle with, that I would cash my Liberty bonds in Seattle, that I would sell my war savings stamps in Nome, Alaska, and at the end of the year in 1920, by the first of the year, it would be an easy matter for me to meet my balance of the payment of $1,500, as he had inquired from me how much wages I was getting, and I was getting $300 a month, that this orchard was a good orchard, commercial orchard, and that the land would pay itself out.

"Q. I see. The land would pay itself out?

"A. That they would insist that they should maintain and keep control of this land because they had so much at stake, and me only having a small amount paid down and they having it all it was necessary for them to insist upon it that they should have the whole, sole control of it until it was paid out on crop payments, so as to protect them for both the bank examiners as well as for their customers."

Following this, on January 6, 1920, the contract of purchase was entered into, and a lease was made by respondents to Marcy covering the lands described in the contract of purchase and the three additional tracts which respondents had acquired before. The lease was on a fifty per cent crop basis, respondents' fifty per cent to go to the bank and be applied toward the payment of the principal of the purchase price, and the bank was made respondents' agent and attorney in fact to represent them in all matters covered by the lease during their absence. Respondent Gudmundson left, to return to Alaska, and did not again visit the land until the fall of 1921. He was there but infrequently and for short periods thereafter, until the fall of 1923, at about which time he became thoroughly dissatisfied, and this action followed.

[1] So far as the complaint seems to allege that the contract was itself so unfair and impossible of performance as to constitute fraud, that cause of action, if it can be called such, has been abandoned by the failure to introduce any evidence to sustain it, and by the successful objection to testimony offered by appellants for the purpose of showing that the price was fair, and, about what the land would have sold for at that time to anyone desiring such property; and that the terms were usual and customary in that locality and such as were often embodied in like contracts. As to the land not being a first-class commercial orchard with an abundance of water for irrigation, a shortage of acreage in orchard, or as to its having been so represented, there is any amount of testimony on every conceivable phase, but little or none of which has a tendency to convince that the representations actually made went to any appreciable degree beyond what was justified by the fact, or were such as to outweigh what Gudmundson saw by personal inspection. The weight of the evidence, as we see it, is to the effect that, at that time, it was quite properly regarded as at least a good commercial orchard by those who ought to know. As to the water, the testimony as to representations is very uncertain, and that Gudmundson had a substantial knowledge of the actual situation can hardly be doubted. There may have been deception in those matters, but, if so, we are convinced that respondents were self-deceived.

[2] The trial court, who saw the witnesses in person and heard their testimony, said, immediately after listening to them:

"As I have already indicated, the case has reached the point where I think the court can decide the main issues between the parties, which is the right or lack of right to a rescission. Incident to that comes the

question of an accounting between these parties. I take with a grain of salt a good portion of the plaintiff's contentions here. I am satisfied that he knew about the shortage of water, and exclude that from the case. He said he did not know anything about orchard land. It must be established by the evidence in the case beyond any controversy that he was induced to make this purchase by the then tenant upon the land, who was to receive and did receive a commission for the sale, and also must be accepted as uncontradicted proof in the case. Therefore any representations that Marcy made to the plaintiff in this action upon which he relied are the defendants' representations, whether they knew about them or not. That he did make the representations as plaintiff says, and substantially the witness Born says, I think there is no question concerning. Those representations were as to material facts; they were such that the plaintiff had a right to rely upon, and he unquestionably did rely upon them. So relying upon them he was induced to enter into a contract which it is plain upon the evidence in the case there never was any possibility of the agreement being carried out successfully. Therefore, if he acted within the three years and discovered the fraud, he is entitled I think to a rescission on that ground.''

The trial court apparently had in mind the rule that fraud is never presumed, but can be established only by testimony which is clear and convincing. But he seems to have gone astray in holding that the agent Marcy, who had been promised a commission by his landlord and principal (the bank), if he found a purchaser, was in a position to bind the bank absolutely by his representations. We think Marcy was not such an agent, but rather he was in the position of the agent whose acts were discussed in the case of *Johnson v. Williams,* 133 Wash.. 613, 234 Pac. 449, who, it seems, made very similar representations to those here charged to Marcy; but he, like Marcy, was only authorized to find a purchaser, and neither he nor Marcy

had any authority whatever to enter into a binding contract of sale of the land. Indeed, Marcy did not even know what price his principal would consider or accept and had no knowledge whatever, so far as the record discloses, as to terms which it would consent to in order to make a sale. Clearly, if the agent in the *Johnson* case did not bind his principals by the representations which he made, then it is equally clear that Marcy did not bind his principal by the representations which he made. In the *Johnson* case it is said, in effect, that an agent with power to find a purchaser only has no power to make representations binding upon his principal beyond those relating to the location and description of the property,

"that is, as to identification of the property, . . . this seemingly upon the theory that an agency authority to find a purchaser necessarily means authority on the part of the agent to point out and identify the property to the prospective purchaser, recognizing, however, that this is quite a different thing from an agent's untrue representation as to the quality of the property, as to its earning power or as to what is capable of being done with it."

The *Johnson* case is based upon *Samson v. Beale,* 27 Wash. 557, 68 Pac. 180, and the rule announced may now be considered settled.

[3] Eliminating, then, the representations made by Marcy, as we must, under authority of the *Johnson* case, there remains only the uncorroborated testimony of respondent Gudmundson to the effect that, while in the bank, he asked the question directly of both Mr. Shultz and Mr. Marcy, whether this land did produce $5,000 per year, and that Mr. Shultz said the books would show it. Needless to say, this is denied by both Marcy and Shultz; and while such a denial is not necessarily conclusive, yet, under all the circumstances

here disclosed, the one witness' unsupported statement cannot be said to be that clear and convincing evidence necessary to establish fraud.

[4] We have disregarded the trial amendment, offered and allowed just as the trial court was about to rule upon the merits of the controversy: first, because the case was not decided below upon that theory; and, second, because, if the case was to be submitted upon the new issue, appellants should have been permitted to meet it by any competent evidence they might have been able to produce within a reasonable time.

[5] Enough has been said to indicate that the judgment must be reversed and the respondents' action dismissed; and since the matter of advances by the appellant bank to respondents is pleaded as an affirmative defense only, and not as a counterclaim, and neither the answer nor the brief of appellants asks for an affirmative judgment, none will be ordered here.

The judgment of dismissal will, however, be without prejudice as to the advances which were so pleaded.

PARKER, MAIN, MITCHELL, and MACKINTOSH, JJ., concur.