[No. 29800.  *En Banc.*  April 10, 1947.]

FRANK J. HOPPER *et al., Appellants,* v. DONALD DWIGHT WILLIAMS *et al., Respondents.*[1]

[1]Reported in 179 P. (2d) 283.

W. B. *Magee* and *Arthur H. Hutchinson,* for appellants.

*Skeel, McKelvy, Henke, Evenson & Uhlmann* and *Dodd & Russell,* for respondents.

STEINERT, J.—Plaintiffs brought suit to cancel a written agreement relating to the purchase by them of certain real and personal property, and to recover the amount paid by them on account of the real estate described in the agreement. They predicated their action on allegations of fraudulent misrepresentation made by the defendants concerning the property. The defendant sellers cross-complained, praying that the purchase agreement be canceled for failure of the plaintiffs to comply with certain of its provisions; that the payments previously made thereunder by the plaintiffs be forfeited to the sellers; and that the sellers' title to the property be quieted. The other named defendants answered, simply denying the allegations of plaintiffs' complaint and praying that it be dismissed. Trial before the court resulted in a decree dismissing the complaint with prejudice, but canceling the written agreement, forfeiting to the defendant sellers the payments theretofore made by the plaintiffs, and quieting in the sellers the title to, and the right to the possession of, the real property, together with the improvements thereon and the fixtures thereto attached. Plaintiffs appealed.

Prior to May, 1943, respondents Donald Dwight Williams, an architect, and Marie Williams, his wife, both of whom will hereinafter be referred to simply as Williams, were

the owners of certain unplatted and unimproved real estate located in the southerly portion of Beacon Hill, in the city of Seattle. In that month they platted the land, describing it as Boeing Heights Addition, comprising one block consisting of thirty-two lots. Because of a serious housing shortage which existed in the city at that time, Williams, the owners of the property, decided to improve it by building thereon, for subsequent sale, a number of houses, under financing arrangements with the Federal Housing Administration, hereinafter referred to as FHA.

There being no city sewers serving that area, Williams made application to the city health department, which had jurisdiction of such matters, for the issuance of a permit, or permits, to install septic tanks on the property as construction of improvements thereon progressed. The health department conducted percolation tests and, as a result thereof, granted permission for the installation of such tanks. Williams then proceeded to erect twenty-eight houses on the property, in compliance with FHA requirements. One of these houses was erected on lot 27, which is the real property involved in this action.

As a part of the financial arrangements, Seattle Trust & Savings Bank took mortgages on the improved properties, such mortgages being insured by FHA. In accordance with the regular routine in such transactions, the city health department made a final inspection of the lot here involved and, on December 21, 1943, advised the bank, by letter, that sewage from the premises was taken care of by a septic tank regularly installed under a permit, and that such tank was in good working order. The FHA thereafter signified its approval, in its formal "Compliance Inspection Report."

After all the houses were completed and ready for occupancy, Williams entered into an agreement with respondents Curtis, doing business as Curtis Realty Company, whereby that company was to act as exclusive agent for the sale of the houses. Announcements were run in the daily press and a large sign was posted on the premises, advertising new homes for war workers and servicemen,

under the provisions of FHA regulations. One of the houses was used temporarily as an office. Respondent F. F. McNamara was a licensed real estate agent and was associated with Curtis Realty Company from about May 16, 1944. On May 21st, he took charge of sales of lots in Boeing Heights and occupied the office on the premises.

Appellants, Frank J. Hopper and Elizabeth M. Hopper, his wife, had been residents of Seattle for a number of years; Mr. Hopper was a sergeant in the United States army, stationed at Fort Worden.

In response to a newspaper advertisement, Mrs. Hopper, accompanied by her daughter, visited the new housing project on Sunday, May 21, 1944, with the view of buying one of the houses, if found satisfactory. She called at the office on the premises, where Mr. McNamara, who had just assumed charge, was at the time engaged in conference with another prospective purchaser. He, however, gave her the keys to several houses and permitted her to go through them. After an inspection, she made a selection of the house on lot 27, and then, with her daughter, returned to the office and indicated her choice. At the same time, she made inquiry of Mr. McNamara relative to a range and a refrigerator, the installation of which by the seller was optional with the purchaser.

Mrs. Hopper testified at the trial that, in her conversation with Mr. McNamara, lasting about twenty minutes, she inquired of him whether the premises were connected with the city sewer, and that he told her they were. This was stoutly denied by Mr. McNamara. Sergeant Hopper, who was also a witness at the trial, testified that he never inquired, nor was ever informed by Mrs. Hopper or anyone else, as to whether there was a sewer connection or a septic tank serving the premises.

While at the office on May 21st, Mrs. Hopper, acting for herself and with power of attorney for her husband, signed a written agreement, denominated an earnest money receipt, for the purchase of lot 27, Boeing Heights Addition, at a price of $4,750, and one electric range at $140, and one

electric refrigerator at $135. At the same time she paid down, as earnest money, the sum of $65.

The agreement provided that, if the offer was accepted by the owners, the sale should be closed by the execution of the owners' established form of real estate contract, not inconsistent with the terms of the earnest money receipt; that, at the time of such closing, the purchasers were to pay the sum of $335 and thereafter the monthly sum of $75, inclusive of interest at the rate of six per cent per annum, on the seventh day of each month, beginning in June, 1944, until the owners' equity, over and above the amount of the mortgage on the property, was paid in full; that the purchasers should join with the owners in an application to the mortgagee and the FHA for a firm commitment to accept the purchasers in substitution of the owners as obligors upon the mortgage and release the owners from further liability thereon, and to execute all forms required by the mortgagee and FHA to effect such release and substitution. The amount of the mortgage was $4,100.

Time was made the essence of the agreement, and the concluding paragraph thereof read as follows:

"There are no verbal or other agreements or representations modifying or affecting this offer. *No representation or condition not endorsed in writing upon this form shall be a part of this contract* [bold-face type]. Purchaser agrees that final inspection of the property and approval thereof by the Federal Housing Administration will constitute approval of completion and acceptance thereof by purchaser."

The offer to purchase, as set forth in the earnest money receipt, was accepted by the owners, and the written instrument was accordingly signed by them. The agreement contained nothing with reference to the particular method of sewage disposal.

On Sunday, May 28th, Sergeant Hopper and his wife visited the premises, examined the house, and talked with Mr. McNamara about the matter of increasing the amount of the initial payment.

On June 7, 1944, appellants, having decided to make a larger down payment than was required by the initial in-

strument, paid to Curtis Realty Company the sum of $1,410, of which $1,135 was to apply on the house and lot, and $275 on the range and refrigerator. This total amount was more than was necessary to pay out the owners' equity over and above the mortgage, and hence there was no further need for the execution of a real estate contract as originally intended. However, appellants were still required, under the initial agreement, to assume the balance of the mortgage according to its terms and to execute the necessary instruments for the release of the owners therefrom and the substitution of themselves as mortgagors.

On Monday, June 12, 1944, appellants took possession of, and moved into, the premises.

On the following Sunday, June 18th, an unfortunate event occurred, which subsequently gave rise to this litigation. Mrs. Hopper at that time discovered that the septic tank was overflowing and saturating the surface of the premises. She at once telephoned her husband, at Fort Worden, acquainting him with the occurrence, and he in turn wrote a letter to Curtis Realty Company, under date of June 21, 1944, stating that a flow of water was "seeping up in yard, which is presumably coming from a faulty cesspool or connections on same." The letter made no claim, however, of any misrepresentation concerning sewers or sewer connections. Curtis Realty Company answered the letter on the following day, stating that the matter had been referred to the builder, Mr. Williams, and would be taken care of promptly.

It appears from the evidence that the owners made frequent and extended efforts to ameliorate the conditions, but apparently without much success. The fault was not, however, with the septic tank or its connections with the house, but arose from the fact that the earth condition in that particular vicinity was not well suited to the use of septic tanks, because of the scarcity of topsoil and the predominance of nonporous clay underneath.

On June 28th, which was after the occurrence just described, Sergeant Hopper came home on a fifteen-day furlough, and spent most of that period in spreading topsoil

on the front yard and preparing a lawn. In the meantime, Mrs. Hopper bought furniture and draperies for the house. Several times during the summer one or the other of the appellants called at the office of Seattle Trust & Savings Bank, making inquiry relative to paying further installments on the property and with reference to the matter of executing the necessary forms for releasing the owners from the mortgage and substituting themselves. It appears that, on or about August 5th, they did execute an FHA form of consent to substitution of mortgagors, but later they declined to execute the actual substitute mortgage agreement. They testified that they refused to sign the latter instrument because the septic tank was never put in proper condition. However, they at no time claimed that any of the respondents had ever made any misrepresentations to them concerning sewer, sewer connections, or septic tanks.

Matters continued in this manner until about December 19, 1944, when appellants instituted this action. In their complaint, they alleged that the respondents induced them to enter into the written agreement of May 21st by falsely representing to them that the residence had a full, complete, and adequate sewer connected with the city sewer mains, and that the property had been inspected and approved by the United States Federal housing inspectors; that appellants did not know of, and could not by reasonable inspection have discovered, the defective system of sewage disposal; and that, had they known the true conditions, they would not have purchased the property. In their prayer, they asked that the agreement of sale and purchase be canceled and that they recover the amount paid by them for the real property, together with the sum of nine hundred dollars for expenditures made by them for moving, upkeep, repairs, and other miscellaneous items. They did not offer in their pleading to return the written agreement, nor did they offer to surrender possession of the premises. On the contrary, they retained the agreement and remained in possession of the property until the time of trial.

The cause came on for trial on May 29, 1945, and, at the conclusion of appellants' evidence, respondents moved that the action be dismissed because appellants had neither alleged in their complaint nor shown by their evidence that they had tendered a deed of the property to the owners or had surrendered possession of the premises to them. The court denied respondents' motion and, over their objection, permitted appellants to reopen their case for the purpose of making proper tender or showing of tender. On reopening, further evidence of a general nature was introduced by appellants, and respondents thereupon put in their evidence. However, no evidence was offered by appellants supporting a tender or offer of any kind.

At the conclusion of all the evidence, respondents renewed their motion and it was then granted by the court. Appellants thereupon asked that the case be reopened again for the same purpose, but the court refused the request and ordered that the complaint be dismissed. Thereafter, appellants moved that the order of dismissal be set aside or, in the alternative, that a new trial be granted. The motion was later argued by counsel and denied by the court. This was followed by the entry of the decree from which this appeal was taken.

Appellants' entire argument is predicated upon the contention that it was not incumbent upon them to tender to the respondent owners a quitclaim deed to the property. The basis for this contention is that, under the rule announced in *Ashford v. Reese,* 132 Wash. 649, 233 Pac. 29, and *First Nat. Bank v. Mapson,* 181 Wash. 196, 42 P. (2d) 782, an executory contract of sale of real estate conveys no title, legal or equitable, to the vendee; and that, *a fortiori,* an earnest money receipt conveys no such title.

Respondents do not dispute the holding or authority of those cases, but contend that the agreement evidenced by the earnest money receipt, under which appellants obtained possession of the property, was specifically enforcible; that consequently it constituted a cloud on the title to the property; and that to remove such cloud appellants should have tendered back a quitclaim deed to the prop-

erty. Respondents further contend that appellants' action for rescission must be dismissed because they failed to restore or tender back that which they had received under the agreement. They also vigorously contend that appellants failed to prove fraud in the transaction and that, even if there had been any misrepresentation made by respondents concerning the sewer system, it was waived by the appellants.

■ It is well to remember that this was an action for rescission of the agreement, not an action for damages, and that equitable principles are to be applied.

■ On the principle that he who seeks equity must do equity, it is the general rule that one who demands rescission of a contract of purchase to which he is a party must restore or offer to restore to the other party whatever he may have received under the contract in the way of money, property, or other consideration or benefit. 3 Black, Rescission and Cancellation (2d ed.) 1485, § 617; 66 C. J. 1510, Vendor and Purchaser, § 1606; 55 Am. Jur. 997, Vendor and Purchaser, § 603; 24 Am. Jur. 16, Fraud and Deceit, § 196.

■ Where there has been a deed of conveyance and a taking of possession of real property, it would seem that nothing less than a tender of a deed of reconveyance and an offer to surrender possession upon condition that the other party shall restore what he has received under the contract will suffice. Where, however, there has been no deed of conveyance, but merely a contract to sell land, it would likewise seem to be sufficient to return, or offer to return, the contract and surrender, or offer to surrender, possession of the property on the same conditions. The circumstances of the particular case must largely determine what it is necessary for the one party to do in order to place the other party *in statu quo.*

■ There is a diversity of opinion on the question whether a restoration of the *status quo,* or an offer to make restoration, is a condition precedent to the commencement or maintenance of an action for rescission of a contract. Some courts hold that it is, while others hold that an offer

to do equity in the premises is sufficient, and still others hold that it is sufficient if the judgment or decree itself accomplishes that end.

This court has laid down a rule which we now are satisfied to follow, namely, that restoration or tender of restoration of property is not a condition precedent to the commencement or maintenance of an action for the rescission of a contract for the purchase of land, but that it is sufficient to show a willingness to do equity. In *Empey v. Northwestern & Pac. Hypotheekbank*, 129 Wash. 392, 225 Pac. 226, the rule was stated in the language above expressed, and the reason therefor was given as follows:

"The action does not proceed upon the theory of a contract already rescinded, but proceeds on the theory that the jurisdiction of a court of equitable cognizance is needed to accomplish that end."

The rule announced in the *Empey* case, *supra,* was approved in *Thompson v. Huston,* 17 Wn. (2d) 457, 135 P. (2d) 834. See, also, *Snarski v. Washington State Colonization Co.,* 53 Wash. 221, 101 Pac. 839; *Mauk v. Lee,* 66 Wash. 184, 119 Pac. 185; 5 Williston, Contracts (Rev. ed.) 4079, § 1469 *et seq.*; 3 Restatement of the Law of Contracts 595, § 349; Annotation, 142 A.L.R. 582.

■ In the instant case, appellants made no offer and expressed no willingness, either in their complaint or in their evidence at the trial, to make any restoration or do any equity whatever. This failure, or refusal, continued even after it had been called to their attention at the first close of their case and after the case was reopened, at their own request, for that very purpose. The trial court was therefore fully justified in dismissing the complaint upon that ground.

There is, however, another ground upon which we rest our decision. As stated above, rescission is here sought on the theory of fraud inducing the sale.

■ Fraud must be proved by clear, satisfactory, and convincing evidence. *Gudmundson v. Commercial Bank & Trust Co.,* 138 Wash. 355, 244 Pac. 676; *Saunders v. Visser,* 20 Wn. (2d) 58, 145 P. (2d) 898.

■ The only evidence of fraud offered by the appellants was the testimony of Mrs. Hopper that the sales agent, Mr. McNamara, told her, in response to her inquiry, that the house in question was connected with the city sewer main. Her testimony was wholly uncorroborated and was categorically denied by Mr. McNamara. If such representation was made to her, it seems strange that, when its alleged falsity became known to her by the condition which presented itself a few weeks later, she never told her husband anything about the alleged misrepresentation. Mr. Hopper frankly admitted that he had never made any inquiry with reference to the sewage system, nor had ever been told by anyone that there was a connection with the city sewer.

The probabilities seem to us to weigh against appellants' present contention. The housing shortage in Seattle at the time was so great that it was hardly necessary to misrepresent property, in the particular respect, in order to sell it. People were willing and eager to buy, and the record in this case shows that every one of the twenty-seven houses in the addition was quickly sold. Moreover, since the owners of the property had secured the permission of the city health department to install septic tanks, because there were no sewers in that area, and had also obtained loans through the FHA on that understanding, it would have been foolish, as well as unnecessary, for them to misrepresent the property in that respect and thus subject themselves to liability for unfortunate situations which might at any time thereafter arise. The facts shown by the evidence in this case do not warrant a finding of fraud.

■ The remaining question is whether appellants' complaint should have been dismissed with prejudice and title to the property quieted in the respondents. Appellants themselves sought cancellation of the written agreement. They did not elect to retain the property and sue for damages. They refused to comply with material terms of the agreement, of which time was made the essence. They failed to assume the outstanding mortgage and release the respondents therefrom, as they had agreed to do, and they

refused to make further payments to the mortgagee, as was their obligation. It was therefore a case for the cancellation of the contract as prayed for by respondents, the forfeiture of the payments previously made by the appellants, and the quieting of the title in the respondents.

The decree is affirmed.

MALLERY, C. J., MILLARD, ROBINSON, SIMPSON, JEFFERS, SCHWELLENBACH, and ABEL, JJ., concur.

[1]Reported in 179 P. (2d) 288.