[No. 32562.   Department Two.   March 1, 1954.]

NEVA F. GNASH, *Appellant*, v. ARTHUR E. SAARI *et al.*, *Respondents.*[1]

[1] Reported in 267 P. (2d) 674.

W. H. Cook and *Peter A. McDonald,* for appellant.

*Walter Scott Acheson* and *Charles H. Heighton,* for respondents.

DONWORTH, J.—This is an appeal from a judgment dismissing an action for damages for fraud in the sale of certain real property. One phase of the case previously was before this court in *Gnash v. Saari,* 40 Wn. (2d) 59, 240 P. (2d) 930. The present action was tried to the court sitting without a jury. The court made findings of fact and conclusions of law and entered judgment for defendants. Plaintiff has appealed.

In substance, appellant's complaint alleged that for some time prior to May 16, 1949, respondents had been the contract owners of the real property described therein and had operated the building situated thereon as an apartment house; that respondents knew that the building had been converted from a single family residence and that its use as an apartment house was in violation of certain enumerated sections of the Seattle building code which made it unlawful to alter, repair, or convert any building to another use unless a permit was first secured from the proper city authorities.

The complaint also alleged that the Federal rent control

act of 1947 was then in effect, that respondents knew of its existence, had applied for adjustments of rents under its provisions, and had been refused, but that they fraudulently concealed this information from appellant.

Appellant further alleged that, although the violation of the provisions of the building code and the denial of the petition for rent adjustments were peculiarly within respondents' knowledge and unknown to appellant, respondents falsely represented that: (1) the property could be operated as income property and was in fact income property, and (2) that the rents had been authorized by rent control authorities at two hundred eighty-eight dollars per month.

Appellant also alleged that respondents' operation of the property as an apartment house in violation of the Seattle building code made the title to the property "unmerchantable," and that respondents had refused to make changes necessary to make the building conform to the requirements of the building code as demanded by appellant. It was finally alleged that, in reliance upon the misrepresentations made by respondents, appellant executed a contract to purchase the property and thereby suffered damages in the sum of six thousand dollars.

In their answer, respondents *admitted* that for some time prior to May 16, 1949, they had been the contract owners of the property and had operated it as an apartment house.

Respondents denied that the title to the property was unmerchantable, admitted the execution of the contract of sale to appellant, and denied that any false or fraudulent representations were made to induce the sale.

The evidence discloses the following facts:

In the summer of 1948, Mrs. Saari's mother, Mrs. Galuska, came from the east to live with respondents. In a short time, she told them she wanted to acquire a place of her own which would yield some income. Mrs. Galuska had little formal education, did not write English, and spoke it only brokenly. When inspecting properties shown her by Mr. De-Turenne, a real-estate agent for Clifton Albright Realty Company, she was accompanied by her daughter.

On October 21, 1948, a contract of sale on the property here involved was executed by the then owners, Mr. and Mrs. Claude Burton, as vendors and by the respondents as vendees, although Mrs. Galuska supplied the money for the down payment. The next day, respondents listed the property for sale with the same realty company.

Mrs. Galuska moved into one of the upstairs apartments and rented the other three. In February, 1949, the first floor of the building was rented for the first time. The rent charged for this unit was one hundred dollars per month. On February 28, 1949, Mr. Saari visited the Seattle rent control office to determine whether the one hundred dollars rent was legal under the rent control act. He was informed that it was, but also learned that the rents being charged for the upstairs units were in excess of the legal maximums. With the aid of the rental authorities, he prepared a petition for increases in rents for the upstairs units, based upon the fact that repairs and improvements had been made since the rent ceilings had been set and also because an additional tenant was living in one unit.

Mr. Saari signed the petition as "landlord" and was told he would be notified later whether the petition would be approved or denied. He made no further inquiries prior to the sale on May 16, 1949. On May 11, 1949, an order denying his petition for higher rents was entered, and, according to records of the rent control authority, a copy of the order was mailed to him. He denied that he ever received a copy of the order.

Appellant had noticed a "for sale" sign on the property and stopped to inspect it. She and a friend were shown through the property by Mrs. Galuska, who told appellant the rent being charged for each apartment. Appellant asked if these rents had been approved by the OPA (the term the parties used to designate the Federal rent control authority) and was referred to Mr. DeTurenne. He told her that the rents amounted to $288 per month (including the rental value of the apartment occupied by Mrs. Galuska), and that these rents had been approved by the OPA.

The rents which Mr. DeTurenne reported to appellant were the same amounts reported to her by Mrs. Galuska.

In addition to the $288 per month in rents from the apartments, there was $12 a month income from the rent of two garages, making the total income from the property as represented to appellant $300 a month.

Appellant inspected the property two or three times before deciding to buy, but she did not check further on the representations made by Mrs. Galuska or Mr. DeTurenne. Appellant never talked directly to respondents and, in fact, thought that Mrs. Galuska was the owner until she saw respondents' names on the contract of sale.

Appellant took immediate possession in May, 1949, continued to charge the same rentals that Mrs. Galuska had been charging, and later redecorated and added new furniture and furnishings at a total cost of about $1,600.

In December, 1949, she applied for a permit to install an additional electric meter downstairs and learned for the first time that the building was classed by the city of Seattle as a single family residence. She was told that substantial alterations would be necessary if she desired to use the building as an apartment house. She had plans drawn incorporating the necessary changes, and the plans were approved and a permit issued authorizing the repairs. Appellant also secured permission from the Seattle department of buildings to continue operation of the building as an apartment house until the repairs were completed. At the time of trial, the work had not begun, but her expert witnesses testified the work would cost approximately $2,650.

Although appellant continued to charge the same rentals, it was not until December, 1951, that she was informed by the OPA that they were in excess of the legal maximums. Thereafter, the OPA set the legal rents at a total of $185 per month for all apartments, a reduction of $93 a month from the rents she had charged before. The garages, not under rent control, continued to rent for a total of $12.

On June 7, 1952, the United States of America started a suit against appellant in the United States district court

at Seattle to recover overcharges and penalties in the total amount of $3,376.50. On September 30, 1952, all rent controls terminated in the Seattle area.

At the time of the trial of this case, the suit in Federal court had not been tried or otherwise disposed of.

Much of the foregoing evidence is undisputed. But there is a serious conflict in the evidence as to just what authority the real-estate agent, Mr. DeTurenne, had to represent to appellant what the rents were at the time of the sale and that they had been approved by the OPA.

Mr. DeTurenne testified that both Mrs. Galuska and Mrs. Saari told him what the rents were and that they had been approved by the OPA, and that the two ladies gave him this information in connection with the listing so he could answer questions asked by prospective purchasers.

Mr. DeTurenne also identified plaintiff's exhibit No. 14, a rent receipt book, which was admitted in evidence, and testified as follows:

"I received that [the receipt book] approximately this time that the sale was made from the Defendants to show the present plaintiff what the rents were."

Mrs. Saari in her testimony denied that she told Mr. DeTurenne what the rents were or that they had been approved by the OPA, and denied that she gave him the receipt book or that she authorized him to make any representations concerning the rent. Mrs. Galuska, having returned to the east to live, did not testify, so, as to her, Mr. DeTurenne's statement is uncontradicted.

Mr. Saari did not talk to either appellant or Mr. DeTurenne before the contract of sale was executed. However, on cross-examination, Mr. Saari was asked:

"So far as you are concerned, Mrs. Galuska was in sole occupancy of the premises, and had authority then to represent the rentals, is that it?"

He replied, "That is right."

Despite the admission in their pleadings that they owned and operated the apartment building, both Mr. and Mrs. Saari testified that they did *not* own the property, but that

Mrs. Galuska did and they merely had the title in their name.

The trial court, after hearing the evidence, took the case under advisement and about five months later rendered a brief memorandum opinion saying that appellant had "not sustained the burden of proof whereby the court could hold the defendants were guilty of fraud," and adding, "in addition to the failure of proof of fraud, there has been no measure of damages proven upon which a court could in any event enter judgment."

The court made findings of fact and conclusions of law, on which a judgment was entered dismissing appellant's complaint with prejudice.

Appellant has appealed, making eleven assignments of error.

At the outset, this court is faced with this situation: The findings of fact are not complete enough to enable this court to determine what the trial court did find on several vital issues.

The first five findings recite facts which are for the most part not in serious dispute and which, in any event, would not bar appellant from a recovery in this action.

Finding No. 6 consists of a single sentence, which states:

"The Court further finds that at no time were the defendants guilty of fraud in connection with the sale of said property to the plaintiff."

Finding No. 7, also one sentence, adds:

"The Court further finds that the plaintiff has failed to prove fraud, and has failed to prove any measure of damages."

As a result of the incompleteness of the findings, this court is in much the same situation as it was faced with in *Bowman v. Webster*, 42 Wn. (2d) 129, 253 P. (2d) 934, in which we said:

"Rule of the Superior Court 17, 34A Wn. (2d) 118, provides that the trial court shall make findings of fact in all equity cases, and in all law cases tried before the court without a jury. . . .

"This rule applies not only in the case of a judgment for the plaintiff, but also where the judgment is for the defendant, in those cases where there has been a complete trial on the merits. [Citing cases.] . . .

"This rule does not require the trial court to make findings in regard to every item of evidence introduced in a case. [Citing cases.]

"It is necessary under the rule, however, for the trial court to make *the ultimate findings of fact concerning all of the material issues.* [Citing cases.]" (Italics ours.)

■ In the case at bar, the findings of fact are so incomplete that this court is unable to determine on what theory the trial court decided the case. Neither the memorandum opinion nor the conclusions of law throw any light on what theory was adopted by the trial court.

Here, as in the *Bowman* case, *supra,* the result is that:

" . . . appellants have been deprived of an opportunity to challenge findings of fact, and any consideration by us of the legal questions involves speculation as to just what legal theory the trial court pursued."

Following the precedent set in *Bowman v. Webster, supra,* and cases cited therein, it will be necessary to set aside the judgment and remand the cause, with instructions to the trial court to enter findings of fact on the material issues set out later in this opinion.

For the guidance of the trial court in further proceedings in this case, we will discuss some of the contentions made by appellant and respondents on this appeal.

■ Appellant contends that respondents, by operating the property as an apartment house in violation of the Seattle building code, made the title to the property unmerchantable. We disagree. The fact that there were some violations of the building code did not impair the title to the property. *Stone v. Sexsmith,* 28 Wn. (2d) 947, 184 P. (2d) 567.

Respondents assert that there can be no recovery by appellant because Mr. DeTurenne, the real-estate agent, had no authority to make any representations which would be binding on respondents. In support of this argument, respondents rely on six cases, which they contend establish

the rule that misrepresentations by a real-estate agent are not binding on the seller.

As authority for the foregoing proposition, respondents cite: *Samson v. Beale,* 27 Wash. 557, 68 Pac. 180; *Johnson v. Williams,* 133 Wash. 613, 234 Pac. 449, 238 Pac. 581; *Gudmundson v. Commercial Bank & Trust Co.,* 138 Wash. 355, 244 Pac. 676; *Christiansen v. Parker,* 152 Wash. 149, 277 Pac. 445; *Stenson v. Thrush,* 36 Wn. (2d) 726, 219 P. (2d) 977; and *Peoples Nat. Bank of Washington v. Brown,* 37 Wn. (2d) 49, 221 P. (2d) 530.

However, these cases do not hold that under no circumstances can a real-estate agent's representations be binding on the seller for whom he acts as agent. Where the facts disclose that the real-estate agent had either express or implied authority from the seller to make the representations, the seller will be bound. For example, in the recent case of *Jenness v. Moses Lake Development Co.,* 39 Wn. (2d) 151, 234 P. (2d) 865, this court held that the sellers were bound by the false representations of their real-estate agent, Farrell, concerning the earnings of a tavern, despite the fact that there was no evidence that Farrell had any express authority to make the representations.

On the issue of the authority of a real-estate agent, we said in the *Jenness* case, *supra:*

"This is not a case such as *Peoples Nat. Bank of Washington v. Brown,* 37 Wn. (2d) 49, 221 P. (2d) 530, and cases therein cited, where a real-estate broker is given authority merely to find a prospective purchaser. It is clear that Farrell [the broker] was entrusted with all the negotiations up to the closing of the transaction. . . .

"Respondent McCusker [one of the sellers] had never seen appellants [the buyers] until shortly before the trial.

"It is plain that the only persons with whom appellants dealt, before closing the deal, were Farrell and Kellett [the manager of the tavern], and that Seijas and McCusker [the sellers] *impliedly authorized* them to conduct the negotiations." (Italics ours.)

In this case, as in the *Jenness* case, *supra,* the real-estate agent was "entrusted with all the negotiations up to the closing of the transaction," and the sellers never met the

buyers until after the contract was executed. In the *Jenness* case, the sellers had contracted to pay the real-estate broker an unusually high commission (16⅔ per cent of the selling price of the property). Respondent asserts that the unusual commission agreement distinguishes that case from this one. But the decision as to the authority of the agent in the *Jenness* case was not based upon the commission agreement alone, and the case is not to be understood as holding that a real-estate agent can have implied authority to make representations binding on his principal only when the commission contract is in some way unique.

It is true that the *Jenness* case was for rescission of the contract and here damages are sought. Furthermore, as respondents contend, a stronger showing of fraud is required to support an action for damages than is needed to entitle a buyer to maintain an action for rescission. But it should be noted that in the *Jenness* case the real-estate agent had only implied authority to make the representations complained of, while in the case at bar the appellant offered testimony and exhibits which, if believed by the trial court, would justify a finding that the real-estate agent had express authority to make the representations.

For instance, Mr. DeTurenne testified that he was expressly authorized by Mrs. Saari and Mrs. Galuska to represent what the rents were and that they were approved by the OPA. In addition, two exhibits, a purchaser's statement and a receipt book, could be considered by the trial court on the issue of whether Mr. DeTurenne was authorized to make any representations concerning the rent.

The rule of law applicable here is given in 8 Am. Jur. 1020, Brokers, § 64, in this language:

"Although there is some authority to the contrary, the better view is that one who employs an agent to sell land is responsible for the representations made by the agent to effect a sale where such representations are within the apparent scope of his authority. . . .

"If the representations are made by the broker with the express sanction of the principal, there is, of course, no reason for not holding the principal liable therefor."

■ The next contention of respondents is that they cannot be liable to appellant because they were not the beneficial owners of the property but merely held the bare legal title for Mrs. Galuska. The argument is untenable. Under the facts in this case, respondents were either principals and Mrs. Galuska was their agent, or Mrs. Galuska was the principal in the transaction and respondents were Mrs. Galuska's agents.

In either event, respondents may be held liable to appellant if the trial court finds that the facts necessary to support this action were established. The rule applicable here is that an agent who conceals the fact of his agency and contracts as the ostensible principal will be personally liable. *Gordon v. Brinton*, 55 Wash. 568, 104 Pac. 832; *Vinye v. American Automobile Co.*, 165 Wash. 161, 4 P. (2d) 851.

Another problem in this case is that of determining the measure of damages to be applied if the trial court concludes that appellant is entitled to recover. She contends her damages should be measured by the "benefit of bargain" rule (the difference between the value of the property had the misrepresentations been true and the actual value).

■ Though this rule frequently has been applied in actions for fraud inducing the sale of property, it has not been suggested by this court that it is the exclusive measure of damages. *Salter v. Heiser*, 39 Wn. (2d) 826, 239 P. (2d) 327.

As we said in that case:

"Where the plaintiff seeks to recover general damages he will be awarded damages giving him the benefit of his bargain. Where he seeks to recover damages not inherent in the 'benefit of bargain' rule, he will be awarded damages for all losses proximately caused by defendant's fraud."

If appellant is entitled to recover damages here, the recovery must be based on the misrepresentations alleged to have been made that the rent control authority had approved the rents being charged. But the undisputed evidence is that the property has not been under rent control since September 30, 1952. That being the case, it would be unjust to allow the benefit of bargain rule to be applied,

since the effect of the alleged misrepresentations which caused the damage to appellant has entirely ceased.

In *Salter v. Heiser, supra,* we cited the general rule relative to loss of rental, as follows:

"Again, loss of rental because of misrepresentations inheres in the difference in value of the leasehold as represented and in actuality."

But in that case the misrepresentation was that the plaintiff who leased resort property could obtain a liquor license for a tavern at the resort, when, in fact, plaintiff could not obtain a license. The representation created no *temporary* disability, as the representation concerning approval of the rents did here. There the damage was permanent, and consequently the amount of the damages flowing from it could be measured by applying the benefit of bargain rule.

■ Here, however, the misrepresentation, if binding on respondents, created only a temporary damage which began and ended prior to the trial. In such a case, the damages were not inherent in the "benefit of bargain" rule, and appellant can recover only the special damages proximately caused by respondents' fraud.

Under the evidence in this case, the special damages shown by appellant's testimony consist of approximately $900 in rentals she lost between the time the rental authorities ordered her rents reduced (January, 1952) and the time that controls ended (September 30, 1952). Other special damages would include the amounts, if any, appellant was forced to expend as a result of the suit filed against her by the United States seeking recovery of rent overcharges.

While we regret the necessity of prolonging this already protracted litigation, the judgment of the trial court must be reversed and the case remanded with instructions to make findings of fact on these material issues: (1) Did either respondent make representations to appellant (directly or by agent) as to the rents being charged at the time of the sale and that such rents had been approved by the rent control authority? (2) Did the real-estate agent (Mr. DeTurenne) have authority, express or implied, to make

representations as to what the rents were and that they had been approved by the rent control authority? (3) Was Mrs. Galuska the agent of respondents when showing appellant the property? (4) Did Mrs. Galuska have authority from respondents, express or implied, to make representations to appellant or to Mr. DeTurenne as to the rents being charged and that such rents had been approved by the rent control authority? (5) Did respondent husband know at the time of the sale that the rents being charged were in excess of the maximum rents approved by the rent control authority, and, if so, did he have any duty to disclose such information to appellant?

In the event the trial court finds in favor of respondents on the disputed issues of fact, judgment shall be entered for respondents. In the event the trial court finds in favor of appellant on these disputed issues, the court may take such additional testimony as it deems proper for the sole purpose of computing the amount of damages. In such event, the measure of damages shall be consistent with the views expressed herein, being limited to appellant's out of pocket loss of rent, plus all liability and expenses necessarily incurred as a result of, or in connection with, the proceedings in the Federal court case, including matters transpiring since the trial of this case (October 20, 1952).

Either party shall have the right to appeal from any judgment finally entered herein by the trial court. Costs on this appeal shall abide the result of the action in the trial court.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and FINLEY, JJ., concur.