M. O. ANDERSON, A. B. C. Packard, Inc.,
a Washington corporation, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, a
Delaware corporation, Defendant.

United States District Court
W. D. Washington, N. D.
Jan. 7, 1958.

Pacht, Ross, Warne & Bernhard, by Stuart L. Kadison, Los Angeles, Cal., Preston, Thorgrimson & Horowitz, by Charles Horowitz, Seattle, Wash., for plaintiffs.

Holman, Mickelwait, Marion, Black & Perkins; J. Paul Coie, William M. Holman, Seattle, Wash., Henry M. Hogan, Daniel Boone, Edward J. McGratty, Jr., Detroit, Mich., for defendant.

RYAN, District Judge.

Plaintiff, A. B. C. Packard, Inc., has moved under Rule 59, F.R.C.P., 28 U.S. C.A., and Local Rule 48, to set aside the verdict of the jury returned on August 28, 1957 and the judgment entered thereon on August 29, 1957 and to grant a new trial. The trial commenced on August 1, 1957 and continued through August 28, 1957 when the jury returned a special verdict and a general verdict for the defendant.

This suit followed the termination on June 30, 1953 of a Buick automobile distributor dealer relationship covering specific areas and counties in Washington and Alaska which had existed since 1936, first between the individual plaintiff, M. O. Anderson, and thereafter corporations organized by him, and the defendant General Motors Corporation, operating through its Buick Motor Division. The distributor dealer contracts had been made annually since March 30, 1942 to the date of termination with Anderson Buick Company, a Washington corporation, the present corporate name of which is A. B. C. Packard, Inc. M. O. Anderson, throughout the entire period since 1936, had been the directing and managing head of this business. General Motors, on June 30, 1953, took over the distribution of its Buick automobiles in the northwest, including the area previously covered by the Anderson contracts, and has since operated there on a factory zone basis of direct distribution to dealers. The Anderson corporation was offered and refused to accept a retail dealership.

Suit was filed in July, 1955. Jurisdiction is predicated upon diversity in citizenship. The original complaint alleged four separate counts. When the suit was called for trial, an amended complaint alleged three counts. Construed liberally, the first count alleged a claim for breach of contract based on an estoppel claimed to have arisen out of alleged oral representations and promises; the second count alleged a claim, sounding in tort, for fraud based on the same alleged oral representations and promises; and the third count attempted to plead a claim for alleged misappropriation by defendant of plaintiff's business good will. Issue was joined by answer which was, in effect, a general denial of the fraud alleged, of the alleged oral misrepresentations and promises, and of consequent damage, and there were pleaded five affirmative defenses, namely, failure to state a claim upon which relief can be granted, the statute of frauds, the statute of limitations, laches and waiver.

Permission was granted the plaintiff to serve, during the trial, a further amended complaint which alleged only two claims, sounding in fraud. It was so served and answer made thereto.

Plaintiff, in a trial memorandum, stated it was its contention that:

"The theories supporting recovery are: first, fraud arising out of the breach of a duty to disclose a plan to terminate plaintiff's business, as well as fraud in the more familiar sense of actionable misrepresentation and promise made with no intention to perform, and secondly, promissory and equitable estoppel, operating against the defendant, to terminate plaintiff's business."

And this, plaintiff followed with a further statement that plaintiff's claims were not dependent

" * * * upon the suggestion, that General Motors did not have the legal right to change its distribution pattern * * * it is not deemed actionable and this case is not grounded upon the termination alone. It is recognized that General Motors may distribute its products as it sees fit so long as its policies do not conflict with the public interest."

Plaintiff's counsel, in his opening statement to the jury, elaborating on the nature of plaintiff's claims, stated:

"Now, this is an action by Anderson claiming a wrongful termination of the distributor-dealership relationship that existed from June 1, 1936 to June 30, 1953. The action is predicated upon a charge of wrongful termination, and the wrongful termination consists of termination after making of misrepresentations concerning the permanency of the distributorship, misrepresentations upon which Anderson relied, and when June 30, 1953 came around and the distributorship was terminated, Anderson was damaged very substantially" (S.M. 71).

The Court, in its charge and in language to which no objection was made or exception taken, advised the jury that plaintiff, A. B. C. Packard, Incorporated

"seeks a verdict for damages which it alleges it sustained and suffered by reason of the wrongful and fraudulent acts of the defendant, General Motors, acting through its officers, agents and employees."

and that

"In brief, the frauds which the plaintiff alleges consist of a non-disclosure of a policy of General Motors as to the continuance of a distributorship franchise, and a false and fraudulent representation concerning the defendant's then existing intention and policy as to the continuance of a distributorship franchise which the plaintiff had for the marketing of the Buick automobiles, parts and accessories" (S. M. 2622).

The jury was also charged that

"General Motors denies that it unlawfully damaged or wrongfully and fraudulently injured the plaintiff in any manner" (S.M. 2622).

The suit, with the service of the amended complaint during trial, became one in which two claims founded in fraud and not in contract were asserted. The trial was had on this theory of plaintiff's claims and they were so submitted to the jury. Without objection or exception, the Court charged:

"that General Motors was under no contractual obligation to continue the Distributor or Dealer Franchise which it had granted the Anderson Buick Company beyond June 30, 1953, the date on which it ended" (S.M. 2636).

and further that

"Recovery, if any is to be had by the plaintiff, therefore, must be predicated not upon the breach of a contractual obligation but solely for a wrong or a violation of a legal right which did not arise from a contract—that is in plain language from a fraud and deceit." (S.M. 2636).

Specifically, and again without objection or exception, the jury were instructed that

"Plaintiff has based its claim broadly upon two contentions—one, an affirmative misrepresentation of the then existing General Motors corporate policy with reference to the continuance of the Distributorship method of operation; and second, that there was a failure to disclose a policy of General Motors with reference to a discontinuance of distributorships which General Motors was required to disclose because of the relationship which existed between Anderson Buick Company and General Motors" (S.M. 2673).

The affirmative misrepresentations alleged in the final complaint were orally made and were never reduced to a writing. They were two in number. The first, it was claimed, was made in a telephone conversation around the middle of July, 1947 by Jerome B. Nash, then the Buick Division, Regional Manager of the Pacific Coast area to Anderson. The details of this conversation were given by Anderson (S.M. 545) and by Nash (S.M. 2085). An analysis of the testimony as to this conversation was given to the jury in the charge (S.M. 2639). There was a sharp conflict in this testimony.

The conversation centered, according to Anderson's testimony, upon the discontinuance by Buick of the Howard distributorship in California and its bearing upon a possible termination of the Anderson distributorship in Washington —as to this Anderson testified that Nash had said:

"You are doing the job, and I. don't think you should get excited at all about it, and you don't have anything at all to worry about as long as you are doing a job" (S.M. 546).

As to this alleged misrepresentation, it was charged that the jury might and should consider the "evidence as to the alleged incident of July, 1947, as well as all the evidence, in determining what occurred and what was said on November 9, 1951 and the purpose with which the parties acted and spoke on that day" (S. M. 2649).

It was ruled upon the trial that recovery might not be had by reason of the misrepresentation alleged to have been made in July, 1947.

Plaintiff's claim, insofar as it is bottomed upon an alleged affirmative misrepresentation, rested solely on a second statement alleged to have been made on November 9, 1951 by Nash to Anderson.

Here, it is well to note, as the Court charged, that

"The misrepresentation alleged in the complaint to have been made on November 9, 1951 is a statement that there was no intention on the part of General Motors to terminate the distributor and dealer franchises of the Anderson Buick Company so long as it continued to penetrate the market and maintain price class performance and for at least so long a period as the Anderson Buick Company required to amortize the $500,-000.00 mortgage it was about to make" (S.M. 2650).

It was plaintiff's claim that this statement was false in that it was not a true and honest statement of the then present and existing policy and intention of the defendant, General Motors.

Anderson's version of this conversation with Nash was given in great detail by him (S.M. p. 709–715); and Nash's version was also before the jury (p. 2091–2094). Again, the testimony presented a sharp conflict; a question of veracity was presented for jury determination. Plaintiff's counsel, in his summation, thus referred to it:

"This is the conflict in testimony. Now in resolving this conflict, and, of course, it is your task to resolve the conflict, you are entitled to all the help you can get from your own experience in this Court and out of it. You can look at other uncontradicted evidence which bears on this conversation. You can appraise the witnesses and you can ask yourselves was Mr. Nash a truthful witness? Which of these two witnesses. am I inclined to believe? You can

ask yourselves which in logic and reason probably happened and which story is more consistent with logic and with reason" (S.M. 2488).

The jury answered these rhetorical questions of counsel by their verdict; they rejected the testimony of Anderson and accepted the testimony of Nash.

In the second count of the complaint, as amended, the plaintiff alleged "that in the period from 1937–1941 the defendant, General Motors, formulated and adopted a policy to terminate the distributorship of the plaintiff, Anderson Buick Company, after the plaintiff had developed the market for Buick automobiles, parts and accessories in the territory assigned to it where it would be more profitable for General Motors itself to distribute; that General Motors thereafter did not disclose this plan to the Anderson Buick Company and did conceal it from

"that company notwithstanding the relationship of the parties which is alleged to have been of such a nature as to require disclosure" (charge of the Court, S.M. 2634).

Basic to this second claim was the plaintiff's contention that a relationship of trust and confidence existed between plaintiff and defendant by which General Motors was bound in good faith under the law to disclose to it such a policy, if it existed.

Plaintiff requested the Court to charge the jury that as a matter of law such a relationship did exist; defendant requested the Court to charge the jury exactly the opposite, to wit, that as a matter of law such a relationship did not exist. The Court declined to grant either request and left the relationship to be determined by the jury, based upon the evidence of the nature of the dealings had between the plaintiff and the defendant. The instructions to the jury as to the law applicable to this phase of plaintiff's claim were neither brief nor perfunctory (S.M. 2644 to 2648).

It was upon the issues thus framed by defendant's denial of these claims asserted by the plaintiff that the jury returned a general verdict for the defendant and against the plaintiff, and a special verdict which was a final disposition, adverse to plaintiff, of all of plaintiff's claims.

By its answer to Interrogatory No. 1, the jury found that on November 9, 1951 Nash did not make the statement attributed to him by Anderson "that Anderson Buick Company need not concern itself about termination of its distributorship as long as it continued to penetrate the market and maintain price class performance and for at least so long a period as was required to amortize the $500,000.00 mortgage." In the wording of this interrogatory, the Court travelled almost entirely on the identical language repeatedly used by plaintiff's counsel both in memoranda submitted and at trial; it was well nigh a paraphrasing of Anderson's testimony; no specific objection was taken to the phrasing of this interrogatory. It plainly and clearly stated the claim of plaintiff.

By its answer to Interrogatory No. 2, the jury found that the making of such a statement upon which plaintiff's first claim was based was not within the scope of the authority of Jerome B. Nash. Here, too, the jury were instructed fully as to the responsibility of the defendant corporation for the acts of its agents (S.M. 2651–2652).

The factual findings of the jury specially expressed in the answers to Interrogatories Nos. 1 and 2 alone bar recovery on the plaintiff's claim based upon the alleged affirmative misrepresentations (Cf. C. I. T. Financial Corp. v. Glover, 2 Cir., 1955, 224 F.2d 44, 46, 47).

The factual findings of the jury are likewise dispositive of plaintiff's claim based upon the alleged nondisclosure of its corporate policy with reference to continuance of the Anderson distributorship.

By its answer to Interrogatory No. 7, the jury found that the relationship between Anderson Buick Company and

General Motors Corporation was not "such a relationship as required the disclosure of such a policy".

By its answer to Interrogatory No. 9(a), the jury found that Anderson Buick Company did not take action in ignorance of such a policy.

More determinative of the merits of plaintiff's claim than all else, are the jury's answers to Interrogatories Nos. 10 and 11.

It was undisputed that continuously from 1936 through June 30, 1953 plaintiff and its predecessors in interest operated under a series of eighteen separate consecutive written agreements. We referred to these agreements at length when ruling on defendant's motion to dismiss, on which decision had been reserved until after the verdict of the jury. It is not necessary to do so again.

Throughout the trial, it was plaintiff's contention that these several agreements were involuntary acts of the plaintiff, that they were executed by the plaintiff under circumstances of "business compulsion", and that they were executed by the plaintiff in reliance upon representations plaintiff alleged were made to it and because of the nondisclosure of the alleged Buick Division policy with reference to the continuance of plaintiff's distributorship.

By its answer to Interrogatory No. 10–A, the jury found that not one of the agreements annually executed on November 1st of each year from 1947 to 1952 was entered into by the plaintiff under a context of business compulsion.

By its answer to Interrogatory No. 10–B, the jury found that not one of these annual agreements was signed by the plaintiff "because of a non-disclosure of a matter which General Motors was required to make to Anderson Buick Company".

These agreements, having been found by the jury to have been the voluntary acts of the plaintiff and not to have been induced by fraud, are in law an intentional and voluntary relinquishment of all of its claims against the defendant which are here asserted.

Measured then by the findings of the jury, the motion now before the Court is without merit or substance.

But plaintiff, on this motion for a new trial, urges that the verdict is against the weight of the evidence and that prejudicial errors were committed by the Court during trial.

With reference to the first ground asserted, plaintiff, on page 1 of its brief, passes adverse judgment on its own cause. There, in a footnote, it states that:

> "Much of the evidence is undisputed. Some of the evidence is conflicting. However, in view of Part III of this Brief, the statement of the case made is as the jury had a right to find it."

This is a plain and frank admission that the evidence presented issues of fact requiring submission to the jury as a matter of law. This statement prefaces an argument that there was evidence sufficient to support a verdict favorable to the plaintiff. Assuming this to be so (although after recording of the jury's verdict we reached a different conclusion on defendant's motion to dismiss), the simple fact remains that the jury found against the plaintiff and in favor of the defendant.

Plaintiff lightly skips by what it describes as "the Court's statement of facts" in the charge to the jury. But the charge was more than a perfunctory "statement of the facts". The entire charge, written as the trial proceeded, was prepared in sections and given to the attorneys; the Court's draft of the entire charge was in counsel's hands almost one week before summations. Full opportunity was given not only to object, but to request amendments and additions. The resumé of the evidence in the charge was given without objection or exception as to its contents. The jury were advised as to those matters which were not in dispute (S.M. 2622–

2633), and as well as to the matters on which there was conflicting evidence.

■ The evidence presented many and varied factual issues; they were pointed out to the jury. Plaintiff's claims were based on specifications of fraud; clear, cogent and convincing evidence was required to substantiate these claims (Forsyth v. Davis, 152 Wash. 595, 278 P. 676); and the establishment of the nine essential elements of fraud set out in Webster v. L. Romano Engineering Corp., 178 Wash. 118, 34 P.2d 428–430 (cf. Swanson v. Solomon, 50 Wash.2d 825, 314 P.2d 655), was the burden which plaintiff carried as a matter of law.

■ The very long statement of plaintiff's counsel of the evidence simply attempts to show that there was in the record sufficient to support factual findings in favor of the plaintiff. However, at this time, with jury findings adverse to the plaintiff, we are only concerned with whether, construing the evidence in the light most favorable to defendant, there is sufficient to support the verdict. Of this, there is no doubt.

We come, then, to the second ground urged in support of this motion, to wit, that prejudical errors were committed by the Court during trial. We shall consider only those assignments of error which have a semblance of substance to them.

Plaintiff argues that the Court erred in its refusal to charge Requested Instruction No. 3. This was a statement that defendant was required, as a matter of law, to disclose to plaintiff its alleged policy with reference to continuance of distributorships.

Anderson, and the corporations through which he functioned, had been a distributor dealer of the Buick automobile from June 1, 1936 through June 30, 1953. Eighteen separate written agreements had been made with the defendant during that period.

It was the contention of the defendant that, as a matter of law, the only duties and obligations owed by either party to the other were those set forth and spelt out in the written contracts, which specifically provided that:

"there are no other agreements or understandings, either oral or in writing between the parties affecting this agreement * * *."

It was also the contention of the defendant that upon the evidence adduced at trial, dehors the contracts, the relationship between the parties was nothing more than a friendly business relationship, where each of the parties had only that trust and confidence in each other's honesty and integrity which might be expected to result from similar business dealings.

The agreements were each definite and unambiguous in their terms. These agreements do not create a relationship of principal and agent, or a relationship fiduciary in nature. Plaintiff, throughout trial, urged that there was a relationship of trust and confidence which required disclosure. Thus, plaintiff contended in its trial memorandum, "that not only the dynamics of the relationship * * * but the facts of the relationship were such as to make it entirely clear that it was in fact one requiring full disclosure."

The charge gave to the jury to determine as a factual issue not only exactly what the relationship between plaintiff and defendant was, but also whether disclosure of the alleged policy was required.

The evidence presented a sharp conflict as to the manner in which plaintiff corporation and defendant operated in their dealings. This conflict also extended to the matters on which plaintiff claimed it sought or received help, assistance, advice or guidance from the defendant.

■ While every contract implies good faith and fair dealing between the parties to it, exactly what was good faith and fair dealing in this suit became a factual issue dependent upon the circumstances as the jury found them to be.

The plaintiff has called to the attention of the Court a recent decision of the New York Court of Appeals as a holding to the contrary. We will assume that the local law of Washington is the same as New York; we find, however, no support for the plaintiff in the opinion cited.

In A. S. Rampell, Inc., v. Hyster Co., 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N. E.2d 371 (decided July 3, 1957), the Court was presented with a question of the legal sufficiency of the complaint. "Plaintiff and its predecessors were distributors of Hyster's products in part of New York and New Jersey, and had enjoyed a dealer-manufacturer relationship for 15 years under written contracts permitting either party to terminate at any time." 3 N.Y.2d at page 374, 165 N.Y.S.2d at page 479, 144 N.E.2d at page 371. The first cause of action asserted a claim against defendant for alleged tortious inducement of plaintiff's employees to terminate their agreements with plaintiff. Observing that the relationship was one of manufacturer and distributor, where there was not competition between economic equals but was that of dependency of the latter upon the former, the Court observed that:

"This dominance taken alone may be insufficient to show such a relation of confidence as would make the action of Hyster here actionable" (3 N.Y.2d at page 376, 165 N.Y.S.2d at page 481, 144 N.E.2d at page 371).

The Court, then proceeding with its inquiry to determine whether the claim was stated in some recognizable form known to New York law (3 N.Y.2d at page 374, 165 N.Y.S.2d at page 479, 144 N.E.2d at page 374), noted that "there are a number of provisions in the contract which indicated the existence of this relation." 3 N.Y.2d at page 377, 165 N.Y.S.2d at page 482, 144 N.E.2d at page 371. It concluded that the complaint stated a cause of action.

This was simply a holding that there were factual allegations sufficient to support a legal conclusion that a relationship of confidence did exist in fact. It was not a holding that such a relationship did exist as a matter of law.

Throughout plaintiff's memorandum on this motion, there is an undertone that plaintiff was prejudiced by continued unreasonable rulings and comments by the Court which limited plaintiff in its proof, particularly of documentary evidence, and otherwise adversely affected plaintiff. The record is barren of any objection of counsel based on such grounds; and this, obviously, was because all counsel were entirely satisfied with the Court's efforts to function with impartiality.

The close of the presentation of the evidence found 138 plaintiff's exhibits and 78 defendant's exhibits in evidence. Although this is short of the large number of documents which had been marked in pretrial (S.M. 357), it is not indicative of unreasonable limitation.

Bearing upon the purpose of the Court, it is important to recall what happened on the very first day of trial (S.M. 119). Here we find the following occurred:

"The Court: Your claims are predicated upon transactions which occurred on July 14, 1947 and on November 9, 1951.

"Mr. Horowitz: Those were the two conversations, your Honor, but you see, the course of the relationship between the two actually started when Mr. Anderson started in 1936, and we would like to show the relationship of the parties from the beginning as bearing on the issues.

"The Court: I will permit it, but it seems to me we must limit the scope of that inquiry, because when we get back to 1936, it is rather remote when we are considering primarily matters that occurred in 1947 and 1951.

"Mr. Horowitz: I understand, your Honor.

"The Court: Remote; and, therefore, while I will permit it, I expect that such proof will be limited in scope and amount.

"Mr. Horowitz: I will not make any further comment on that at this time, your Honor.

"The Court: You may, if you feel it is necessary to protect the record, at any time. Don't feel reluctant to put upon the record any statement that you feel is necessary.

"Mr. Horowitz: Then may I say, your Honor, the relationship of the parties from 1936 on to the later events is important from the understanding of the parties on the distributorship, and its long term character, and upon the duty to disclose with each other fairly, and upon the background upon the basis on which later events transpired.

"The Court: The jury will be the ones to determine the importance.

"Mr. Horowitz: Yes, your Honor.

"The Court: I simply state my personal view" (S.M. 119–120).

It should again be noted that the corporation plaintiff—A. B. C. Packard Inc. (formerly called Anderson Buick Company)—was incorporated on March 30, 1942.

The Court early indicated its purpose in endeavoring to limit the number of the exhibits when it said in the presence of the jury:

"The Court: My only purpose, counsel, is to try to simplify this case. Otherwise, we are going to run into a thousand exhibits and it will prove only to confuse the jury. I want to limit the number of documentary as much as possible. That is my only purpose." (S.M. 143).

Again, the Court remarked:

"I am anxious that this trial move along and while that is desirable, justice is essential and we are not going to unduly hurry the case. My only purpose is to see that the issues and the proof are confined here, and that the jury have all the evidence which may have some bearing on the issues. I think I have had the cooperation of counsel from both sides in that." (S.M. 162).

A long and voluminous exhibit had been offered in evidence; at the suggestion of the Court, counsel conferred during recess and, as the result, a single sheet of paper was received in evidence by consent. At this time the Court told the jury:

"I have had the cooperation of counsel from the beginning of this trial and they have indicated to me they want to do everything possible to reduce the number of documentary exhibits and to limit the evidence so that it is confined to those matters which are relevant to the issues presented, and I am grateful to counsel for their cooperation." (S.M. 169).

There are two additional matters which deserve a passing reference. Plaintiff urges that the Court erred in its rulings relating to the proper measure and elements of damage, and that the Court erred in charging the jury "that since the final agreement of November 1, 1952 was entered into after July 10, 1952, the date of the Portland meeting, there may be no claim by plaintiff that this agreement was signed in reliance upon the alleged representations or because of the alleged non-disclosure."

It was plaintiff's contention on trial that it was entitled, in the event of a verdict in its favor, not only to losses proximately caused by its reliance upon defendant's good faith and truthfulness in making representations, but also to whatever profits it might have had if General Motors had continued to renew the distributorship dealer agreements for "as long as it continued to penetrate the market and maintain price class performance and for at least so long a period as was required to amortize the $500,-000.00 mortgage." Colloquially expressed, plaintiff maintained that the so-called "benefit of the bargain" rule was to be applied to admeasure its damages under the claims it asserted, instead of the "out-of-pocket" rule.

This position was taken by plaintiff during trial; after consideration and research by the Court, the arguments of

plaintiff were rejected and now after reconsideration no error is found.

■ Assuming arguendo that there was error and that the "benefit of the bargain" rule should have been applied, the entire matter is now moot in view of the jury findings that plaintiff had not been defrauded, that the representations were not made as alleged, that factually there was no duty to disclose and no damage resulted from any act of plaintiff done because of any non-disclosure.

The Court ruled that in this suit plaintiff was "entitled to recover damages for losses proximately caused by defendant's fraud" (Salter v. Heiser, 39 Wash.2d 826, 239 P.2d 327, 331). See also Buttnick v. Clothier, 1953, 43 Wash.2d 667, 263 P.2d 266, and Gnash v. Saari, 1954, 44 Wash. 2d 312, 267 P.2d 674. Plaintiff has cited on this motion no decision not considered and examined by the Court during trial.

■ With reference to the last contention of plaintiff, it must be noted that it was undisputed that at a meeting held in Portland on July 10, 1952 General Motors notified plaintiff that it would not extend its distributorship arrangements beyond June 30, 1953, and that it was after this meeting and on November 1, 1952 the last and final Distributor Dealer agreement was signed by the plaintiff. The charge left to the jury to determine whether the agreement of November 1, 1952 was signed by plaintiff because of "business compulsion". The jury found by their special verdict that it had not been so executed by the plaintiff. As to all of the annual agreements from 1947 through November 1, 1951, it was left to the jury to determine whether execution of them had been procured by fraud of the defendant. The jury found that the agreements had not been so procured.

With reference to the November 1, 1952 agreement, the Court instructed the jury:

"I charge you that since the final agreement of November 1, 1952 was entered into after July 10, 1952—the date of the Portland meeting—there may be no claim by plaintiff that this agreement was signed in reliance upon the alleged misrepresentation or because of the alleged nondisclosure." (S.M. 2671).

Where possible error could exist in this statement is more than this Court can understand.

The jury were not instructed that the execution of this last agreement constituted a waiver of all claims which plaintiff might have had against the defendant. There were no claims which plaintiff could assert except those arising out of the fraud alleged, for the written agreements remained unchanged by any subsequent writing, and by their terms a definite termination date had been set. The quoted portion of the charge followed immediately upon instructions as to "business compulsion" and was intended to and did advise the jury, in light of what preceded, that although they could and should consider whether the agreement of November 1, 1952 was executed under a context of business compulsion, there could at that time be no further reliance by plaintiff upon defendant's misrepresentations, and there could be no claim of acts done then because of a nondisclosure, because the definite termination date of June 30, 1953 had been announced to plaintiff in no uncertain terms.

This motion is denied; and the Clerk is directed to enter upon the docket this memorandum as an order denying plaintiff's motion to set aside the jury's verdict and to grant a new trial.

### On Taxation of Costs

Defendant has moved under Rule 54 (d) F.R.C.P. to review the action of the Clerk in the taxation of costs.

Defendant objects to the disallowance of five items of disbursements.

■ *Item 3—Deposition Costs—*

These disbursements have been disallowed, save for the deposition of Henry Bauer, $62.01. Local Rule 56(g) (6) precludes allowance of the other similar

items of disbursements, including those for copies of these depositions. The determination of the Clerk as to this item is approved.

■ Item 4—Copies of Necessary Papers—

This item is allowed only as to certified copy of mortgage, $3; copying of the remaining papers and records was only to serve convenience of counsel in preparation and trial.

■ Item 5—Court Reporter's Fees—

The transcript of the minutes of the trial were necessary for the use of the Court. Each trial day found the minutes on the bench and frequent reference to them was made during trial by the Court, to the knowledge of counsel. When ruling upon various motions which involved the legal sufficiency of the evidence presented, the Court referred to the trial minutes. When passing upon requests to charge and in the preparation of the charge itself, the Court had frequent occasion to examine the testimony. This was particularly so when the Court prepared its statement of the undisputed facts, as well as when the analysis of the testimony was written on matters as to which there was a conflict.

Early in the trial the Court inquired of the reporters whether the trial transcript was being secured by counsel, and was advised by the reporters that it was. The Court was furnished with a daily transcript by the reporters but at no time did the Court enter an order so providing or ask either counsel to provide the transcripts. The Court assumed that counsel had complied with the Local Rules. The minutes were necessarily obtained for use on the trial of this suit. The item on the Bill of Costs "Court Reporter's Fees" is allowed to the extent of $17.05 and $2,185, totaling $2,202.05, and is disallowed as to the charge for copies. This memorandum shall be an order entered nunc pro tunc ordering a copy of the minutes.

■ Item 7—Miscellaneous Service Fees—

There is no authority for the allowance of an attorney's fee on the taking of a deposition.

■ It is a local practice, which should be followed and of which counsel has chargeable knowledge, that only fees of the United States Marshal for the service of subpoenae are to be allowed. The determination of the Clerk is approved.

To the costs taxed by the Clerk is added:

Item 4—Copy of mortgage $ 3.00
Item 5—Court Reporter's Fees 2202.05
Heretofore taxed by Clerk 408.77

Total $2613.82

As against the individual plaintiff, M. O. Anderson, all of these costs are also taxed, save as to Item 5—Court Reporters' Fees, which are to be taxed as against the individual plaintiff, M. O. Anderson, only for stenographic minutes up to the time of the dismissal of this plaintiff's claim. So ordered.