[No. 38109. Department Two. September 29, 1966.]

OLD WINDMILL RANCH, *Respondent,* v. DENVER B. SMOTHER-MAN *et al., Appellants.**

*Reported in 418 P.2d 720.

*Collins & Allan* (*W. Edward Allan,* of counsel), for appellants.

*R. W. Gibson,* for respondent.

DONWORTH, J.—Defendants Smotherman and defendant St. Paul Fire and Marine Insurance Company appeal from a judgment against them rendered by the trial court sitting without a jury. The judgment was based on findings of fact and conclusions of law entered after the trial of this rather complex case.

Mr. Smotherman was the manager of the Old Windmill Ranch from 1960 until September 30, 1962. During that period, the ranch was owned by a partnership composed of the following named persons: Roger S. Anderson, M.D., dealing in his sole and separate property; Roger C. Anderson and Jean A. Anderson, husband and wife; Carand Corporation, a Washington corporation; and John M. Peterson and Suzanne C. Peterson, husband and wife. None of the members of the partnership resided on the ranch.

Mr. Smotherman was in charge of the growing of crops on the ranch. The major crop was alfalfa hay. He controlled and supervised the planting and harvesting of the hay. He hired and fired the ranch hands who "bucked" the hay. Mr. Smotherman also had authority and responsibility to sell the hay at the prices determined by Roger S. Anderson, one of the partners.

All the records of the ranch were kept by a bookkeeper (unidentified in the record) who apparently received the information sent to Roger S. Anderson by Mr. Smotherman concerning the operation of the ranch. This included payroll records, disbursements for other ranch expenses, and income from the sale of hay. Periodically, the records of the ranch were reviewed by the certified public accountant who had handled the ranch accounting from the beginning of the partnership in 1953. The ranch accounting was on a "cash" basis, *i.e.*, there was no account in the official records showing the amounts of money owed by purchasers of hay.

Apparently, from time to time, Mr. Smotherman supplied

Dr. Roger S. Anderson with other information which was not incorporated into the bookkeeping records of the ranch, because there are references in the record to memoranda and telephone calls between Dr. Anderson and Mr. Smotherman concerning such things as hay production and amount of hay stored. The record appears to indicate that hay production figures in the hands of Dr. Anderson were fairly complete (although perhaps imprecise) but that the records as to the amount of hay stored at the ranch for sale did not accurately show the amount of hay available for sale at all times. Although the ranch owners would have preferred to have a physical running inventory account showing the amount of hay in each of the four barns at all times, and, apparently, had tried from time to time to have one set up, no such records were regularly kept by anyone. The only available record of the actual amount of hay available for sale was the sum of the amounts stored in the four barns on the property, based on an imprecise "book" inventory based on deduction of sales tonnages from the maximum total capacity of the four barns together.

The barns, together, had a maximum capacity of 2,300 tons of hay. Dr. Anderson testified that most, if not all, of the production from any one year was stored with the intention of selling the bulk of the crop after the first of the following year. Wages paid to hay buckers was based on the amount of hay handled by each man. The ranch payroll account for the 1962 hay crop indicates that the men were paid for harvesting 2,990 tons of hay. Mr. Smotherman testified that the ranch production for the year 1962 was 2,864.1 tons. Some of the hay was sold from the fields but most of it was placed in the barns.

The hay was sold to the purchasers by the ton. In order to obtain an accurate weight of the amount of hay sold to a purchaser, the hay was taken by truck to a public scale house located at George, Washington, by each driver after his truck was loaded with hay, before the hay was delivered to the buyer. The weight of the truck itself was known from a prior weighing while empty. The weight of the loaded truck was measured. The difference between the

weight of the truck (tare) and its weight when loaded established the net weight of the load of hay. This information was recorded on a "weight ticket" which was made out in quadruplicate. On the weight ticket was placed the following additional information: date, name of the seller of the hay, name of the buyer of the hay, truck license number, the initials of the person (weighmaster or his employee) who weighed the hay, and the license number of the weighmaster; occasionally, the number of bales of hay in the load was also recorded on the ticket. The completed weight ticket was then authenticated by a weighmaster's seal. The value of the hay was not normally included in the ticket.

The exact procedure for keeping records at the public scale appears to be as follows: Whoever owns the truck pays the small weighing fee. Each truck owner who frequently brings loads for weighing purchases a book of tickets in his own name. The books are kept by the scale house operator. Whenever the truck owned by such person is brought to the scale, his book of weight tickets is used to record the weighing information. The truck driver is responsible for giving the information to the weighmaster or his employee. The information concerning the sale of the hay is entered by the person filling out the weight ticket. The weight ticket books were kept at the public scale house. Invariably, at least one of the copies of the weight ticket is kept by the public scale house for its own records. Occasionally, the seller of the hay will ask the scale house to keep his copy and to send it to him later. The truck driver receives the other two copies (or three copies if he receives the seller's copy).

Mr. Smotherman owned two trucks, one of which could, and often did, tow a trailer, which he also owned. He did not operate the trucks himself, however. Jess Daniels leased these trucks and trailer from Mr. Smotherman for the purpose of hauling hay, and he paid Mr. Smotherman for the use of the trucks and trailer according to the weight hauled on them. In so far as this lawsuit is concerned, all the hay hauled on these trucks and trailer belonged to

either Old Windmill Ranch, Mr. Smotherman, or Daniels himself.

Effective September 30, 1962, Mr. Smotherman's employment with Old Windmill Ranch was terminated after it had been sold. At that time, the 1962 hay crop had been harvested and most of it was still stored in the barns. The hay was not sold with the ranch, but was still owned by the partnership, which planned to sell it. The partners took a book inventory on October 1, 1962, for the purpose of completion of insurance reports on the hay. The amount of hay shown by this inventory was not revealed in the record. Later in October, the partners became aware that some of the hay was being sold without their knowledge.

The partnership then took steps to curtail such sales and, although the record is not entirely clear, it appears that proceeds of the sales of which the partnership had knowledge at that time were paid directly to the partnership.

However, this caused the partnership to become suspicious of Mr. Smotherman, who they thought was the person negotiating the sales. They decided to check the weight tickets at the public scale house to determine how many sales of their hay had been made in the past year or so for which the partnership had not been paid.

The record does not show how many ticket books were checked. Ten such ticket books were admitted in evidence as plaintiff's exhibit No. 12.

Certain loads of hay represented by certain tickets were claimed by the partnership as belonging to Old Windmill Ranch. Many weight tickets apparently matched deposits made in the Old Windmill Ranch bank account. The total value of the hay represented by weight tickets for which no deposit could be found was $13,629.32. This value was computed by multiplying the weight of the hay on each ticket by the price per ton and those amounts were added to produce the claim of the partnership against Mr. Smotherman. At no place in the evidence is there a total hay tonnage figure showing how much hay this value represents.

The balance of proceeds from the sale of hay which could not be related to hay weight tickets was approximately

$2,700 according to exhibit No. 14. Some of these deposits probably were not from sales of baled hay or from sales of the 1962 hay crop, but it would appear that at least $1,200 of the deposits were proceeds from the sale of baled hay which was a part of the 1962 hay crop. None of the $2,700 of deposits of hay proceeds was credited by the ranch as being proceeds from weight tickets for which no deposits were found.

Among the 10 weight ticket books introduced in evidence was one book marked as belonging to Old Windmill Ranch in which were several tickets which showed Mr. Smotherman to be the owner-seller of those particular loads of hay. All of the tickets in this book were used. In addition, there was another weight ticket book which was marked as belonging to Mr. Smotherman, but which had originally been marked as belonging to Old Windmill Ranch. All of the used tickets (some were unused) in this latter book showed Mr. Smotherman to be the owner-seller of all the loads of hay weighed in this book of tickets. Of the tickets which show Mr. Smotherman to have been the owner-seller, the partnership claimed ownership of the hay represented by 17 of the weight tickets. The hay represented by these weight tickets is valued at $4,523. This amount was included in the $13,629.32 damages claimed by the partnership and awarded to respondents by the judgment of the trial court.

There is evidence in the record from which the trial court could have found that both Mr. Smotherman and Mr. Daniels had a considerable amount of hay for sale which was not produced on the Old Windmill Ranch premises. Apparently, the trial court chose to disregard such evidence on the basis that Mr. Smotherman was a fiduciary of Old Windmill Ranch partnership and that it was his duty to account for their hay, and to keep his records so that he could clearly distinguish his own hay from that of the partnership.

Appellants have assigned error to the trial court's finding of fact No. 19, conclusion of law No. 3, and the judgment.

Finding of fact No. 19 reads:

That in the instance of certain sales to one Ed Dietsch, Arlington Feed Company, Carl Jurgens, C. F. Tasker, and Jesse Thompson, plaintiff has shown to the satisfaction of the Court that all such sales were sales of hay belonging to the plaintiff, and that the plaintiff received not the proceeds from the sale thereof, and, that the defendant Denver B. Smotherman failed to show to the Court that in any of these instances the hay was not in fact the hay belonging to the plaintiff, or that the proceeds thereof were properly paid over and delivered to the plaintiff nor did the defendant, Denver B. Smotherman, establish to the satisfaction of the Court that the defendant had not in some wise benefited from such sales by the conversion of the proceeds thereof to his own use.

Conclusion of law No. 3 reads:

That the total of the foregoing for which plaintiff should have judgment is the sum of $13,629.32.

Appellants' argument can be quickly summarized. Appellants argue that the proceeds of the sale of hay for which deposits were shown and the proceeds of hay for which respondents received judgment would require a hay production of in excess of 3,400 tons from the Old Windmill Ranch during the 1962 season. Appellants claim this is not physically possible. Appellants also claim that the proper theory on which the partnership should bring this suit is to first prove how much hay the partnership owned, and then to prove that Mr. Smotherman sold part of it and converted the proceeds to his own use. Appellants claim that, although there is no official "accounts receivable" account in the records of the Old Windmill Ranch, there are, in fact, physical accounts receivable, and that such accounts are collected by the partnership from time to time, but that the partnership refused to make any showing as to what physical accounts receivable may exist, and that such debts are peculiarly within the knowledge of the partnership.

The trial court has not aided this court by any oral opinion or memorandum opinion. Such an opinion is not required, but it is often very helpful to this court's understanding of the disposition of the case made by the trial

court, if one is rendered. The trial court made no finding as to the total hay production of Old Windmill Ranch during the 1962 hay season. The trial court made no finding as to how much Old Windmill Ranch hay was available for sale at any time which might have been material in this lawsuit. The four barns held 2,300 tons when full.

There was no claim that the hay owned by Mr. Smotherman was confused with the hay belonging to the ranch, but only that the records at the public scale house were confused, and that some of the hay weight tickets showed Mr. Smotherman to be the owner when, in fact, it was alleged that the partnership was the owner. We fail to see how the partnership can claim to have available for sale more hay than the ranch actually could have physically produced and stored and had for sale during the year 1962. A finding as to the 1962 hay production or amount of hay available for sale was essential in view of the fact that there appears to be evidence that the partnership had collected accounts receivable from time to time (see exhibit 14), and that there are hay proceeds from the sale of a portion of this 1962 hay crop for which the partnership has been paid, but for which respondents have made no other attempt to account as 1962 production proceeds. As a practical matter, the bale breakage and shrinkage should also be considered as affecting this total. All of these factors were omitted from the findings made by the trial court. These findings are material to show how much proceeds, as a maximum, may have been converted by Mr. Smotherman. We cannot make findings of fact. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959). Since the trial court failed to make the material findings of fact which would show the amount of the 1962 hay production of the Old Windmill Ranch, or the amount of hay available for sale, we cannot pass upon appellants' assignments of error.

In *Gnash v. Saari,* 44 Wn.2d 312, 267 P.2d 674 (1954), and *Bowman v. Webster,* 42 Wn.2d 129, 253 P.2d 934 (1953), we reversed judgments and remanded the cases to the trial court for the purpose of making the findings of fact mate-

rial to the determination of the case. In *Bowman v. Webster, supra* at 134, we stated:

It is necessary under the rule, however, for the trial court to make the ultimate findings of fact concerning all of the material issues. [Citations omitted.]

. . . .

The remedy most frequently applied has been to reverse and remand with instructions to the judge who tried the action to make and enter the necessary findings of fact and conclusions of law, to be followed by the entry of judgment from which either party may appeal. *Colvin v. Clark*, 83 Wash. 376, 145 Pac. 419; [Additional citations omitted]. A statement of the reasons why, in such a situation, it is preferable to afford this remedy rather than to require a new trial, is set out in *Colvin v. Clark supra*.

The rule and remedy applicable in the above three cited cases is applicable in the present case.

The judgment of the trial court is vacated and the case remanded with instructions to make a finding of fact as to (1) the amount of hay produced by the ranch during the appropriate seasons, or (2) the amount of hay available for sale during the appropriate periods, and (3) the amounts of hay unaccounted for by proceeds deposited by respondents during the appropriate periods or by other ascertained dispositions such as uses or losses of hay not attributable to Mr. Smotherman's failure to account. Additional evidence may be taken by the trial court as it deems necessary in order to make these findings. When these findings are made and appropriate conclusions of law and judgment are entered based thereon, any aggrieved party may appeal from such judgment. Costs of this appeal will abide the final determination of the case as permitted by Rule on Appeal 55 (b) (1).

ROSELLINI, C. J., HILL and WEAVER, JJ., and REVELLE, J. Pro Tem., concur.