[No. 31632.   Department One.   August 16, 1951.]

WILLIAM S. JENNESS et al., Appellants, v. MOSES LAKE DEVELOPMENT COMPANY et al., Respondents.[1]

[1]Reported in 234 P. (2d) 865.

*Riddell, Riddell, Williams & Madden,* for appellants.

*Army Seijas, Solie M. Ringold* and *Acheson & Smith,* for respondents.

DONWORTH, J.—Plaintiffs brought this action to rescind, on the ground of fraud, a contract of purchase and sale of the White Elephant tavern, restaurant, and hotel business at Moses Lake, including the real estate connected therewith. Defendants Moses Lake Development Company and Matt McCusker cross-complained, seeking to recover for damage to the real estate.

The action was tried to the court sitting without a jury. The court entered findings of fact in which it found that defendants' agents had induced plaintiffs to purchase this property by certain false representations, but in its conclusions of law stated that plaintiffs were not entitled to rely thereon. After plaintiffs' motion for judgment notwithstanding the decision or, in the alternative, for a new trial had been denied, the court entered a decree dismissing the complaint and cross-complaint. Plaintiffs appealed from this decree, but defendants did not take any cross-appeal.

There are two questions presented by this appeal. First, did appellants have a right to rely on the false representations concerning the property; and second, if they had a right to rely thereon, are the sellers liable in an action for rescission where the representations were made by their agents without authority?

Appellants are the purchasers of the tavern, restaurant, and hotel business and the real estate involved herein. The business, which bore the name "White Elephant" tavern, was purchased from a partnership consisting of respondents Seijas and McCusker. The real estate on which the business was conducted was purchased from the Moses Lake Development Company, a corporation, all the stock of which was owned by Seijas and McCusker. For some time after the property was acquired in July, 1946, McCusker supervised the partnership business, although he did not live in Moses Lake and was engaged in many other activities. Seijas, a Seattle attorney, owned a half interest but was not active in the business, being, as he testified, a silent partner. The actual management of the business from and after April, 1948, was in the hands of one Kellett, a bartender, who lived on the premises and did most of the work.

Appellants William and Ann Jenness participated in the negotiations giving rise to this litigation and will be referred to herein as though they were the only appellants. Spencer, the other appellant, did not become associated with them until after the alleged misrepresentations were made.

Appellants first learned of the White Elephant tavern from an advertisement inserted by the MacPherson Realty Co. in a Seattle newspaper. The advertisement contained the eye-catching phrase, "This is a big money maker." Mrs. Jenness telephoned the office of MacPherson Realty Co., and it was arranged that salesmen from that office would call at the Jenness home.

The trial of this case consumed five days, and some forty-eight exhibits were offered in evidence. The testimony of the parties is sharply in conflict as to just what was said at the various meetings. It is not practicable to attempt to set forth in detail all of the ramifications of this controversy. However, the following is a brief resume of the salient facts:

Farrell and Larsen, salesmen from the MacPherson office, met with appellants at the Jenness home in Seattle two days after Mrs. Jenness called. They talked generally of the

possibilities of the Moses Lake area, and, according to appellants, in response to an inquiry, the salesmen told them that the business grossed $6,000 and netted $3,000 a month. The price asked was $60,000. Appellants, who had owned and operated taverns and a pinball concession for some years in Minnesota before moving to Seattle, were sufficiently interested that several days later, on September 30, 1948, they went to Moses Lake and again met with Farrell and Larsen.

This meeting took place at the White Elephant tavern. The Jenness' were introduced to Kellett, the manager, and looked over the place somewhat perfunctorily. According to appellants, Kellett and Farrell reiterated Farrell's earlier statement that the business grossed $6,000 and netted $3,000 per month, and Kellett also told them that the business was not seasonal. According to Mrs. Jenness, appellants were expecting to make the monthly payments for the place out of the net revenue, and for that reason she was particularly anxious to ascertain with exactness what it would be. She obtained pencil and paper and made notes as Farrell and Kellett told her that the pinball machines netted $200 a week and went with the place, punchboards netted $100 a week, the bar (serving both liquor and food) grossed $3,000 and netted $1,500 a month, cards netted $100 a week, and the rooms netted $250 a month.

Although these figures showed a gross of only a little over $5,000 per month, they showed a net of more than '$3,000 per month, and, according to Mrs. Jenness' testimony, the latter was the figure in which they were primarily interested. It should be mentioned, parenthetically, that all parties used the term "net" to mean the amount of gross revenues remaining after paying for the merchandise but before paying expenses of operation.

Kellett and Farrell denied making any representations as testified by appellants, asserting that they made the books of the business available to appellants and told them to look for themselves. The so-called books consisted of daily reports showing the total cash received and paid out each day from April 13, 1948, to September 29, 1948, together with

some loose invoices. The books of account containing statements of profit and loss regarding this operation were in Seattle and were never offered for appellants' inspection. Appellants admit that the daily reports for the period mentioned were made available to them and were placed on the table before them. However, they testified that they did not examine them carefully because Kellett and Farrell had already told them what they wanted to know.

Appellants were at the tavern only two hours and became satisfied with what they saw and were told. To Farrell's surprise, they showed a desire to sign up, and he (to paraphrase his testimony) prepared an earnest money receipt as fast as he could and had appellants sign it.

About a week later, appellants had their attorneys prepare escrow instructions, which were signed by all parties to the transaction. W. R. MacPherson was designated therein as escrow agent.

Appellant William Jenness then drove from Seattle to Minnesota, stopping briefly en route at the White Elephant. While in the east, he raised $5,000 and returned to Seattle about November 5, 1948. This money was then deposited with the escrow agent, together with a quitclaim deed to appellants' home in Seattle (the equity in which was agreed to be worth $6,000). The total down payment required by the earnest money receipt ($11,000) was thus made by appellants. The balance of the consideration ($49,000) was payable $1,000 per month including six per cent interest, beginning thirty days after delivery of possession.

The transaction was closed at the White Elephant December 8, 1948, when the transfer of the tavern license to appellants had been approved by the state liquor control board, and possession was then delivered to appellants under circumstances hereinafter described.

After the earnest money receipt had been signed, but before the transaction was closed, Jenness learned that the pinball machines did not go with the place, as he had been told earlier. There is a sharp conflict in the testimony as to what disposition Seijas consented to make after Jenness talked to him about this matter in Seattle. Whichever ver-

sion of the discussion of this problem is correct, the fact remains that Seijas refused to make an adjustment regarding the machines when the sale was consummated.

At that time, the amount of the inventory was higher than Jenness had anticipated, and he did not have sufficient cash to pay for it in accordance with the agreement nor to pay prorated insurance premiums. Because of the misunderstanding concerning the pinball machines and the amount of inventory, Jenness asked if the deal could be called off amicably. Seijas told him it could be called off but not amicably. Seijas then began to write a letter to the state liquor control board concerning the license for the tavern. Jenness saw him writing something but could not tell what it was. Farrell told Jenness that Seijas was preparing a notice of forfeiture. Jenness, whose counsel was not present at this meeting, testified that he thought they had him "in the middle of a squeeze play" and that respondents were going to forfeit his $11,000 down payment. He therefore raised the necessary money by giving Farrell a bill of sale conveying his new car and by borrowing $200 from Spencer. Jenness paid Seijas for the inventory ($1,525.66) and insurance ($274.06) and was given possession of the property and business.

Next day, December 9, 1948, appellants began operating the tavern and continued until January 10, 1949, at which time they abandoned it and turned the keys over to respondents because, after a month's operation of the business, they concluded that they had been defrauded. After quitclaiming the real property and inventory to respondents, appellants instituted this action for rescission.

At the trial it was shown that the business had not grossed $6,000 or netted $3,000 per month, but, on the contrary, had lost money during the two years and four months that it had been operated by the partnership. Furthermore, the business was seasonal to a great extent. The trial court made the following finding regarding respondents' misrepresentations:

"That the Plaintiffs were induced to purchase said White Elephant in question by the representations of Mr. Richard

C. Kellett, the bartender who ran the business of the said White Elephant, and of Don Farrell, Salesman employed by MacPherson Select Homes, to the following effect:

"(a) That the average net monthly total throughout the year of the beer and wine sales on the premises, after deducting the wholesale cost of said beer and wine but before deducting any other expense of operation, had been Three Thousand Dollars ($3,000.00).

"(b) That the net weekly 'take' from its pinball machines and phonograph had approximated Two Hundred Dollars ($200.00) throughout the year.

"(c) That the two (2) pinball machines and the Wurlitzer phonograph upon the property were included in the sale.

"That the above representations were false."

Appellants state in their brief that the words "the beer and wine sales" in subparagraph (a) of this finding of fact were used inadvertently and that the record shows that the words "the entire business" were intended. We have carefully examined the testimony with reference to the representations made by respondents and find the *net* income from beer and wine sales (including food sold) was represented to be $1,500 per month. We, therefore, revise subparagraph (a) by substituting the words "Fifteen Hundred Dollars ($1,500)" for the words "Three Thousand Dollars ($3,000)."

■ With this amendment, the findings of fact entered by the trial court are adopted as the findings of this court. The fraudulent misrepresentations were proven by clear, cogent, and convincing evidence.

Appellants' assignments of error are stated in their brief as follows:

"1. That the Trial court erred in holding that appellants were not entitled to rely upon the representations made to them by the manager of the business and by the real estate agent.

"2. That the Trial Court erred in not permitting appellants to rescind the contract and recover their down payment.

"3. That the Trial Court erred in quieting the title of W. R. MacPherson, Jr., as trustee, to the real estate which constituted part of appellants' down payment.

"4. That the Trial Court erred in denying appellants' motion for judgment notwithstanding the Court's oral decision.

"5. That the Trial Court erred in assessing costs against appellants.

"6. That the Trial Court erred in not granting appellants judgment in any event against the real estate broker and his agents for the recovery of appellants' home which the broker received as part of his commission on this transaction."

The first five assignments of error are treated together by appellants in their argument and will be so treated here. Assignments of error two to five are dependent on our disposition of the first assignment of error, to-wit: That the trial court erred in holding that appellants were not entitled to rely upon the representations made to them by the manager of the business and the real-estate agent.

The trial court did not specify the reasons for its conclusion that appellants had no right to rely upon the misrepresentations referred to in finding No. XVI, quoted above. We are of the opinion that there are two distinct legal questions involved. The first is whether appellants were entitled to rely on the representations as to income without making any investigation. The second is whether respondents Seijas and McKusker are liable for the representations made by their agents. The second question cannot arise unless the first is resolved in favor of appellants.

Appellants contend that, as to representations made with the intent they be believed and acted upon, the buyer is under no duty to investigate but has the right, without investigating, to rely upon the truth of the representations. Where the representations are as to facts peculiarly within the speaker's knowledge, appellants' assertion is supported by much authority.

In *Christensen v. Koch*, 85 Wash. 472, 148 Pac. 585, this court said:

"Ordinary prudence does not require a person to test the truthfulness of representations made to him by another as of his own knowledge with the intent that they shall be believed and acted upon, even though the party to whom such representations are made may have an opportunity to ascertain the truth for himself."

See, also, *Boehme v. Broadway Theater Co.*, 91 Wash. 104, 157 Pac. 218, and *Bliss v. Clebanck*, 136 Wash. 32, 238 Pac. 979.

In *Cunningham v. Studio Theatre, Inc.*, 38 Wn. (2d) 417, 229 P. (2d) 890, and in *Rummer v. Throop*, 38 Wn. (2d) 624, 231 P. (2d) 313, this court quoted with approval this statement of the law concerning the right to rely:

" 'The rule is followed at the present time in practically all American jurisdictions, in respect of transactions involving both real and personal property, that one to whom a positive, distinct, and definite representation has been made is entitled to rely on such representation and need not make further inquiry concerning the particular facts involved. This rule is a corollary to the broad principle of a general right of reliance upon positive statements. Under this rule it is sufficient if the representations are of a character to induce action, and do induce it, and the only question to be considered is whether the misrepresentations actually deceived and misled the complaining party. Under such circumstances, it is immaterial that the means of knowledge are open to the complaining party, or easily available to him, and that he may ascertain the truth by proper inquiry or investigation.' [23 Am. Jur. 970, Fraud and Deceit, § 161.]"

Respondents strenuously argue that, the books having been handed to appellants, they cannot now claim they had a right to rely on representations as to the income of the business. This argument presupposes there was a duty upon appellants to investigate the representations made to them.

There are two answers to respondents' contention. The first is that, assuming that they were under a duty to investigate the daily sheets and invoices, such an investigation would not have revealed a true picture of the business because these so-called books covered only about five months of operation (April 13 to September 29, 1948), and then showed only daily cash receipts and disbursements. The real books of account, showing the profit and loss resulting from two years' operation of the business by respondents McCusker and Seijas, were in the possession of an accountant in Seattle, and these were never offered to appellants.

Appellants testified that they did not look at the so-called books placed before them because they did not think that daily reports and loose invoices would give them an accurate impression of the state of the business.

■■ The second answer to respondents' argument is that, under the rule followed in this state, appellants were under no duty to investigate the representations made to them.

In *Duffy v. Blake,* 80 Wash. 643, 141 Pac. 1149, it was stated:

"While it is true that the means of acquiring knowledge of the character of the goods was open to Mr. Duffy, and while the profits of the business, as shown by the books of account, were open to him, in order to acquire this knowledge it was necessary for him to make an investigation of the stock of goods and of the books. He did not attempt to do this; and we think he was not required to do it, but might rely upon the positive statements of Mr. Blake as to the value of the goods and as to the profits which had been theretofore made. We think this is especially so when the inventory was taken by Mr. Blake who knew that Mr. Duffy did not know the value of the goods, and knew that in all probability he would not inquire further as to the value of the goods, or as to the amount of profits that had been theretofore made."

Tested by the foregoing rules, we conclude that the vendees had a right to rely on the representations. Unquestionably, appellants were naive and credulous, particularly in the light of their experience in the tavern business, but the rule is well settled in this jurisdiction that a wrongdoer cannot defend his wrongful actions by calling attention to his victim's gullibility. *Wooddy v. Benton Water Co.,* 54 Wash. 124, 102 Pac. 1054, 132 Am. St. 1102; *Stewart v. Larkin,* 74 Wash. 681, 134 Pac. 186; *Cunningham v. Studio Theatre, Inc., supra.*

We are of the opinion that appellants had a right to rely on the representations, and that the remedy of rescission is not to be denied them because they relied thereon without investigating.

■ Respondents· Seijas and McCusker, however, assert that rescission cannot be had against them because the false

representations were not made by them but by their agents, who, in making such representations, were acting without authority. While there was no showing at the trial that either Kellett or Farrell had express authority to make such representations, we are of the opinion that both of them had implied authority to do so.

This is not a case such as *Peoples Nat. Bank of Washington v. Brown*, 37 Wn. (2d) 49, 221 P. (2d) 530, and cases therein cited, where a real-estate broker is given authority merely to find a prospective purchaser. It is clear that Farrell was entrusted with all the negotiations up to the closing of the transaction. Respondent Seijas testified regarding the final meeting on December 8, 1948, when Jenness asked if the deal could be called off amicably, as follows:

"And I walked away from them, because I wasn't going to get into any negotiations. I had not been in any negotiations with Mr. Jenness. I didn't intend to."

Respondent McCusker had never seen appellants until shortly before the trial.

It is plain that the only persons with whom appellants dealt, before closing the deal, were Ferrell and Kellett, and that Seijas and McCusker impliedly authorized them to conduct the negotiations. It also appears that, instead of the usual commission, Farrell was to receive $10,000 for making the sale. The commission was paid him by the conveyance of the equity in appellants' home (valued at $6,000) and $4,000, payable in cash over a period of time. This is equivalent to $16\frac{2}{3}$ per cent of the selling price of the property. The size of the commission is much larger than would ordinarily be paid for merely finding a prospective purchaser.

Kellett was in practically sole control of the operation of the partnership business. He made out the daily reports, received the revenue from the operation, paid the bills, made out tax returns, and handled all the details. McCusker checked with him occasionally when in Moses Lake, but his

principal business interests were elsewhere. Seijas knew virtually nothing about the operation of the business except that he thought it was making money because he occasionally received some cash from it. Under these circumstances, it must be held that Kellett had implied authority to make statements to a prospective purchaser as to the income of the business.

We are of the opinion that, having given Farrell authority to conduct all the negotiations and having placed Kellett in charge of the operation of the business, Seijas and McCusker cannot now say they did not have implied authority to tell the purchasers how much the business netted and what was included in the sale.

We hold, for the reasons stated herein, that appellants are entitled to a rescission of their purchase of the White Elephant tavern. Therefore, the decree of the trial court is reversed, and the cause is remanded with instructions to enter a decree consistent with the views herein expressed, containing such provisions as the trial court may deem necessary or proper to restore the parties to their original positions.

SCHWELLENBACH, C. J., BEALS, HILL, and FINLEY, JJ., concur.

---

October 4, 1951. Petition for rehearing denied.