IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ALLEGIANCE PROPERTIES, LLC, a Washington Limited Liability Company, and ROBERT A. GILLES, INC., a Washington corporation, | ) ) ) ) ) | No. 36896-3-III |
| Petitioners, | ) ) | |
| | ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| JANET E. RICHART, a single woman; and Does 1-10, | ) ) ) | |
| Respondents. | ) ) | |

FEARING, J. — The buyers of real estate, Allegiance Properties, LLC and Robert

Gilles, Inc. (collectively Allegiance) sue the seller, Janet Richart, as the result of

underground oil storage tanks and soil contamination being present on the property,

despite representations by the seller to the contrary. The trial court granted summary

judgment dismissal of all contract and common law claims, but reserved for trial the

buyer's claim under the Model Toxics Control Act (MTCA), former ch. 70.105D (2016)

(this chapter was recodified as chapter 70A 305 RCW, effective July 11, 2020: we cite to

the former version, effective in 2017 at the time of the events in this case.). We reverse

both rulings, thereby dismissing the MTCA cause of action, but remanding for further proceedings the causes of action for fraud and misrepresentation.

FACTS

This appeal involves the purchase of a commercial parcel and building by Allegiance from Janet Richart in 2015. After the filing of this suit, Richart died, and her estate has been substituted as a party. We continue to refer to Janet Richart as the defendant in this suit.

In May 2001, Janet Richart purchased the purchaser's interest in a real estate contract for a commercial building, constructed in 1907, located on the southwest corner of the intersection of Monroe Street and Carlisle Avenue in Spokane. Richart acquired the property from Michael J. O'Brien and Marguerite V. O'Brien. While the O'Briens owned the building, Allegiance's principals, Kevin McKee and Robert Gilles, served as property managers.

In April 2001, before purchasing the commercial building, Janet Richart procured a visual inspection report. Under the subheading "FUEL SOURCE," the report disclosed:

> There are several old pipes going into the ground on the SW corner of the building. It would be advisable to get information from the owner on the status of these tanks. Recommend checking with local fire department for closure and removal of these tanks. Normally they are to be closed and removed after 12 months, recommend further investigation.

2

Clerk's Papers (CP) at 564, 572. We do not know whether Richart asked the O'Briens for more information regarding the status of the tanks before she purchased the building.

In its appellate brief, Allegiance writes that, according to two declarations of Banner Fuel employees, Janet Richart paid for the pumping of fuel oil into one of the underground storage tanks and paid Banner Fuel to maintain one of the inside furnaces that burned the oil stored in one or more of the tanks. Allegiance cites CP 61 and 63 for the location of the declarations in the record. We find no such declarations at the specified pages.

During fifteen years of ownership of the Carlisle Avenue building, Janet Richart operated an antique business, The Vintage Rabbit. In October of 2015, Richart and Kevin McKee, managing member of Allegiance, discussed the sale of the building to Allegiance. Richart's real estate agent Ryan Towner prepared a purchase and sale agreement, in which Richart offered to sell her vendee's interest in the commercial building to Allegiance for $410,000. Richart signed the proposed agreement on November 4, 2015. Towner sent the agreement to McKee.

Paragraph 5 of the November 4 proposed purchase and sale agreement, prepared by Janet Richart's agent, granted Allegiance a thirty-day contingency period, in which to rescind the transaction if not satisfied with the condition of the property. The paragraph stated, in part:

3

Buyer's obligations under this Agreement are conditioned upon Buyer's satisfaction in Buyer's sole discretion, concerning all aspects of the Property, including its physical condition; the presence of or absence of any hazardous substances. . . . This Agreement shall terminate and Buyer shall receive a refund of the earnest money unless Buyer gives written notice to Seller within ___30___ days . . . (the "Feasibility Period") of Mutual Acceptance stating that this condition is satisfied.

CP at 19. Paragraph 12 of the agreement read:

12. SELLER'S REPRESENTATIONS . . . There are no Hazardous Substances . . . currently located in, on, or under the Property in a manner or quantity that presently violates any Environmental Law . . . [T]here are no underground storage tanks located on the Property.

CP at 22.

After November 4, 2015, Janet Richart and Kevin McKee negotiated the price for the commercial building. Between November 4 and 10, Richart reduced her asking price to $405,000. In turn, on November 10, 2015, Richart signed a seller's disclosure statement. In the statement, Richart checked boxes that declared she did not know if the property contained any environmental substances or contamination and she did not know whether any fuel storage tanks were present on the property. Richart handwrote "to survive closing" on the first page of the seller's disclosure statement. CP at 38.

After receiving Janet Richart's offer to sell the Carlisle Avenue building, Kevin McKee, on behalf of Allegiance, attempted to hire an inspector that could complete an inspection of the property within thirty days. McKee learned that, because of busy schedules, no local inspector could complete a feasibility study within a month. So

4

Allegiance requested a ninety-day, rather than a thirty-day, inspection period from Janet Richart. McKee typed a November 11, 2015 e-mail to Janet Richart's real estate agent Ryan Towner, which message read:

> Thanks Ryan. I think we may be just too far apart. At [$]365,000 I'm willing to take the risk. At $405,000 with all the uncertainties, it is just not worth it. Not only are we looking at rehab costs—windows, brickwork, roof, heating, framing, lighting, flooring, plumbing, landscaping, asphalt, drainage—but also the unknowns. The property condition report indicates Jan doesn't know a lot of the answers regarding the shape of the building. Are there buried oil tanks, lead, asbestos? What remediation is the city going to require? What about change of use requirements? I met with the fire marshal yesterday about something else, he was requiring a sprinkler system on that rehab. I suppose if Jan wanted to give me a 90 day feasibility study, and be willing to drop the price if there are any unknown costs or requirements, I could entertain a higher price. Otherwise, I'm done.
> Best of Luck,
> Kevin

CP at 122.

After receiving Kevin McKee's November 11 e-mail, Janet Richart lowered the purchase price to $395,000. The parties did not amend the purchase and sale agreement to extend the feasibility period beyond the thirty-day period contemplated in the original draft agreement.

On November 15, 2015, Kevin McKee, on behalf of Allegiance, signed the purchase and sale agreement, whose front page contained numerous purchase price numbers scribbled and interlineated with the final price being $395,000. Paragraphs 5 and 12 as initially drafted by Ryan Towner, respectively the paragraphs authorizing a

5

feasibility study and containing seller representatives, remained unchanged in the final agreement.

Under the Carlisle Avenue building purchase and sale agreement first drafted by Ryan Towner, the sale would close within fourteen days after removal of all contingencies. In the final signed agreement, the parties agreed to extend closing to January 15, 2016. Thereafter, the parties mutually extended the closing date multiple times until the sale closed on March 1, 2016.

The purchase and sale agreement also included an Inspection Addendum executed by the parties, bearing dates November 3 and November 10, 2015. Paragraph 1.a. provided, in part:

> 1.☐a. INSPECTION CONTINGENCY. This Agreement is conditioned on Buyer's subjective satisfaction with inspections of the Property and the improvements on the Property. Buyer's inspections may include, at Buyer's option and without limitation, the structural, mechanical and general condition of the improvements to the Property, compliance with building and zoning codes, an inspection of the Property for hazardous materials, a pest inspection, and a soils/stability inspection. The inspection must be performed by Buyer or a licensed person (or exempt from licensing) under Chapter 18.280 RCW.
> . . . .
> BUYER'S NOTICE. This inspection contingency SHALL CONCLUSIVELY BE DEEMED WAIVED unless within _____days (10 days if not filled in) after mutual acceptance of this Agreement, (the "Initial Inspection Period"), Buyer gives notice (1) approving the inspection and waiving this contingency; (2) disapproving the inspection and terminating the Agreement; (3) that Buyer will conduct additional inspections; or (4) proposing repairs to the property or modifications to the Agreement. If Buyer disapproves the inspection and terminates the Agreement, the Earnest Money shall be refunded to Buyer

6

. . . .
ATTENTION BUYER:  If Buyer fails to give timely notice, then this inspection contingency shall be deemed waived and Seller shall not be obligated to make any repairs or modifications.
. . . .
b. Additional Inspections.  If an inspector so recommends, Buyer may obtain further evaluation of any item by a specialist at Buyer's option and expense if, on or before the end of the Initial Inspection Period, Buyer provides Seller a copy of the inspector's recommendation and notice that Buyer will seek additional inspections.  If Buyer gives timely notice of additional inspections, Buyer shall have _____10_____ (5 days if not filled in) after giving the notice to obtain the additional inspection(s) by a specialist.
. . . .
e. Oil Storage Tanks.  Any inspection regarding oil storage tanks or contamination from such tanks shall be limited solely to determining the presence or non-presence of oil storage tanks on the Property, unless otherwise agreed upon in writing by Buyer and Seller.

CP at 35-36 (boldface omitted).  In the original document, the parties hand marked the box next to the numeral 1 at the beginning of the paragraph.

Paragraph 4 of the Inspection Addendum included the following provision:

4.☐WAIVER OF INSPECTION.  Buyer has been advised to obtain a building, hazardous substances, building and zoning code, pest or soils/stability inspections, and to condition the closing of this Agreement on the results of such inspection, but Buyer elects to waive the right and buy the Property in its present condition.  Buyer acknowledges that the decision to waive Buyer's inspection options was based on Buyer's personal inspection and Buyer has not relied on representations by Seller, Listing Broker or Selling Broker.

CP at 36 (boldface omitted).  Unlike paragraph 1, the parties left the box next to the numeral 4 in this paragraph blank.

7

Before closing of the sale on March 1, 2016, Allegiance did not conduct any feasibility studies or inspections, including environmental inspections. After execution of the purchase and sale agreement on November 6, 2015, Allegiance never sought an extension of the feasibility study period.

After closing on the purchase of the vendee's interest, Allegiance took possession of the Carlisle Avenue building. In May of 2016, an inspector from the city of Spokane found evidence of underground storage tanks on the property. Kevin McKee contacted Rob's Demolition, a company that removes underground storage tanks. After discovering nine underground heating oil tanks, Rob's Demolition removed five of the tanks and filled the remaining four. All nine abandoned tanks were previously used to store heating oil for the building. Each tank was approximately 300 gallons in size. Rob's Demolition sent soil samples taken around all nine underground storage tanks to Test America, whose testing revealed petroleum contaminated soil below one of the tanks, numbered tank 7.

Allegiance reported the soil contamination to the Washington State Department of Ecology (DOE). DOE recommended that Allegiance excavate and remove the contamination. According to Jeffrey Leppo, a senior environmental geologist and owner of Leppo Consulting, LLC, Allegiance failed to notify the public under the provisions of MTCA before conducting remediation work on the Carlisle Avenue land.

8

PROCEDURE

Allegiance sued Janet Richart alleging that Richart failed to disclose the existence of the nine underground storage tanks on the Carlisle Avenue property. CP 3-16. Allegiance asserted claims for: (1) fraud, (2) intentional misrepresentation, (3) negligent misrepresentation, (4) breach of warranty, (5) relief under MTCA, (6) violation of the Consumer Protection Act, ch. 19.86 RCW, and (7) breach of written contract. Allegiance sought damages, but not rescission of the sale.

Janet Richart denied liability under all claims. Richart raised the affirmative defenses, among others, of actual knowledge by Allegiance of the existence of underground storage tanks, waiver, estoppel, and failure to comply with MTCA.

Janet Richart moved for summary judgment. In a declaration in support of her motion for summary judgment, Richart denied any memory, at the time of selling the Carlisle Avenue property to Allegiance, of the fifteen-year-old inspection report she obtained when she purchased the Carlisle Avenue building. She sought dismissal of all but the MTCA claims on the basis that she never misrepresented the condition of the property and Allegiance assumed any risk of the presence of underground tanks and soil contamination.

As part of her summary judgment motion, Janet Richart also argued that Allegiance, in equity or contractually, waived its right to assert and was estopped from asserting an MTCA claim. Richart declared that she never received written advance

9

notice, before Allegiance's contractor performed remedial work. She also declared that, during her ownership of the property, the underground storage tanks were not used. Richart averred that she never used or disposed of any heating oil from the tanks.

During summary judgment oral argument, Janet Richart's counsel commented:

> But let's talk a little bit about MTCA and what is and isn't. Okay. We never said that she isn't a PLP [potentially liable person]. That's conceded. Under the statutory definition, she's a PLP. The issue isn't whether she's a PLP. The issue is whether at the time she was a PLP, an owner/operator, there was a release on the property. And we've presented evidence, in the way of her declaration, that there was no evidence of a release during the time they owned it. Counsel said something again, no evidence in the record, he said all ten tanks leaked. No evidence in the record of that. There was evidence of one tank that leaks.

Report of Proceedings (RP) at 50.

The trial court granted Janet Richart's motion for partial summary judgment as to Allegiance's claims for fraud, intentional misrepresentation, negligent misrepresentation, breach of contract, breach of warranty, and the Consumer Protection Act. Summary judgment was denied on the MTCA claim. The trial court later denied motions for reconsideration filed by each party. This court's commissioner granted discretionary review of the summary judgment rulings.

No. 36896-3-III
*Allegiance Properties LLC v. Richart*

LAW AND ANALYSIS

Feasibility Period

In a letter decision granting summary judgment, the trial court emphasized that, in Kevin McKee's November 11, 2015 e-mail message, Allegiance forwarded a counteroffer to Janet Richart, which offer included new terms. Allegiance wanted a $40,000 reduction in price and ninety days to conduct a feasibility study. According to the trial court, the parties, following the counteroffer, agreed to a $10,000 price reduction and a ninety days feasibility study. The court noted that, absent Allegiance's request for ninety days to complete a feasibility study, Allegiance would have been entitled to the property in the condition warranted by Janet Richart. We agree with Allegiance that the trial court misread the e-mail and the parties' conduct thereafter. The parties never agreed to extend the feasibility period, or, at the least, a dispute of facts exists as to whether the parties agreed to extend the feasibility period.

We review a trial court's decision on a motion for summary judgment de novo. *Clark County Fire District No. 5 v. Bullivant Houser Bailey P.C.*, 180 Wn. App. 689, 698, 324 P.3d 743 (2014). When reviewing a summary judgment order, this court engages in the same inquiry as the trial court by viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 270, 208 P.3d 1092 (2009). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on

11

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). A material fact is one on which the outcome of the litigation depends in whole or in part. *Atherton Condominium Apartment-Owners Association Board of Directors v. Blume Development Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). The nonmoving party in a summary judgment may not rely on speculation. *Specialty Asphalt & Construction, LLC v. Lincoln County*, 191 Wn.2d 182, 191, 421 P.3d 925 (2018). .

We observe that the purchase and sale agreement falls silent on enlarging the feasibility period. The trial court mistakenly conflated the extensions of the closing date with the the contract feasibility period. Janet Richart did not even argue before the trial court that she extended the feasibility period to ninety days.

No document shows that Janet Richart agreed to an extension of the feasibility period. Instead, she counteroffered to Allegiance's counteroffer with another offer that contained no promise to extend the period. Generally, a purported acceptance that changes the terms of the offer in any material respect operates only as a counteroffer and does not consummate a contract. *Sea-Van Investments Associates v. Hamilton*, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994). Therefore, Janet Richart's response to Kevin McKee's November 11 e-mail message canceled any of the terms mentioned by McKee in the message. Allegiance instead accepted Richart's counterproposal, and the executed purchase and sale agreement retained the thirty-day feasibility period.

Section 22(a) of Allegiance's and Janet Richart's executed purchase and sale agreement contained an integration clause. The subparagraph read:

Complete Agreement. This Agreement and any addenda and exhibits thereto state the entire understanding of Buyer and Seller regarding the sale of the Property. *There are no verbal or other written agreements which modify or affect the Agreement*.

CP at 26 (emphasis added). An integration clause is a strong indication that the parties intended complete integration of a written agreement. *M.A. Mortenson Co. v. Timberline Software Corp.*, 140 Wn.2d 568, 579-80, 998 P.2d 305 (2000).

At the time Kevin McKee sent the November 11, 2015 e-mail, the parties continued negotiations. Had the parties intended for a ninety days feasibility study as contemplated by the e-mail, one would assume the written agreement, signed four days later by the buyer, would have altered the feasibility period clause.

In her declaration, Janet Richart testified that she extended the feasibility study period. Nevertheless, Kevin McKee denied this allegation in his responding declaration. Although this court need not resolve this factual dispute between Richart and McKee, the records support McKee's version of the facts.

The trial court may have reasoned that multiple delays in closing resulted from Allegiance's desire for additional time to complete a feasibility study. The factual record contains evidence that all delays resulted from gaining written approval of the underlying

seller and holder of the real estate contract. At the least, a question of fact exists as to whether Janet Richart afforded Allegiance additional time for a feasibility study

Acceptance of Risk

Janet Richart contends that, even if the parties did not extend the feasibility study period, Allegiance, by failing to inspect the Carlisle Avenue property during the thirty-day feasibility period, accepted the property in its present condition and accepted the risk of environmental contamination. In essence, Richart asserts waiver. Richart also contends that, under language in the purchase and sale agreement and the inspection addendum, Allegiance purchased the property "as is." Richart cites primarily to paragraph 4 of the inspection addendum to support her claim. Richart further argues that Allegiance's claims for fraud, intentional misrepresentation, and negligent misrepresentation do not survive her summary judgment motion because the undisputed facts show no justifiable reliance on any representations. We disagree.

Allegiance contends that, since the feasibility period was never extended, Allegiance was justified in relying on Janet Richart's representations in paragraph 12(i) and disclosures in the purchase and sale agreement. Allegiance urges that the underground storage tanks were not reasonably ascertainable because it could not find someone to conduct a phase I study in thirty days. Allegiance further contends it had no duty to find the storage tanks based on Richart's written representations.

14

To analyze a claim of negligent misrepresentation, this court asks whether: (1) the defendant made a negligent misrepresentation, (2) a party relied on the misrepresentation causing the party harm, and (3) the party was justified in relying on the misrepresentation. *Hoel v. Rose*, 125 Wn. App. 14, 18, 105 P.3d 395 (2004). To prevail on a claim of negligent misrepresentation, a plaintiff must prove by clear, cogent, and convincing evidence that he or she justifiably relied on the information that the defendant negligently supplied. *Hoel v. Rose*, 125 Wn. App at 18. The law of fraud and intentional misrepresentation also requires justifiable reliance. Whether a party justifiably relies on information is a question of fact generally not amendable to summary judgment. *Babcock v. Mason County Fire District No. 6*, 144 Wn.2d 774, 792, 30 P.3d 1261 (2001).

We confront principles of law and Washington decisions that clash. On the one hand, when the complaining party can reasonably ascertain correct information, it may not justifiably rely on the other party's statement. *Beckendorf v. Beckendorf*, 76 Wn.2d 457, 464, 457 P.2d 603 (1969); *Rainier National Bank, Bellevue Midlakes Branch v. Clausing*, 34 Wn. App. 441, 446, 661 P.2d 1015 (1983). A plaintiff claiming negligent misrepresentation must not have been negligent in relying on the representation. *Ross v. Kirner*, 162 Wn.2d 493, 500, 172 P.3d 701 (2007).

On the other hand, when the seller gives the buyer a positive, distinct, and definite representation, the buyer may rely on that representation and need not conduct further inquiry concerning the particular facts involved. *Douglas Northwest, Inc. v. Bill O'Brien*

15

*& Sons Construction, Inc.*, 64 Wn. App. 661, 679, 828 P.2d 565 (1992). Ordinary prudence does not require a person to test the truthfulness of representations made to him by another who intends the representations be believed and acted on, even though the party to whom such representations are made may have an opportunity to ascertain the truth for himself. *Jennes v. Moses Lake Development Co.*, 39 Wn.2d 151, 159, 234 P.2d 865 (1951). Under this rule, if the representations are of a character to induce action and do induce it, the only question to be considered is whether the misrepresentations actually deceived and misled the complaining party. *Jennes v. Moses Lake Development Co.*, 39 Wn.2d at 159. Under such circumstances, even if the buyer had relevant information easily available to him or her, the buyer lacks any duty to review the information. *Jennes v. Moses Lake Development Co.*, 39 Wn.2d at 159.

We, at least for purposes of reviewing a summary judgment dismissal of the buyer's claim, rely on the second line of principles. *Beckendorf v. Beckendorf* and *Rainier National Bank, Bellevue Midlakes Branch v. Clausing* contained no facts of a definitive, written representation. In paragraph 12 of the purchase and sale agreement, Janet Richart affirmatively proclaimed the lack of hazardous substances and underground storage tanks on the Carlisle Avenue property. The second line of rules promotes honesty and fair dealing in business transactions.

Allegiance relies on two real estate boundary cases to support its proposition that it had a right to rely on Janet Richart's representations in the purchase and sale agreement

that there were no hazardous substances or underground storage tanks on the Carlisle Avenue property. In *Weinstein v. Sprecher*, 2 Wn. App. 325, 467 P.2d 890 (1970), Max and Florence Weinstein purchased a tract of land from E. E. Sprecher. The written agreement described the tract as containing "30 acres more or less." *Weinstein v. Sprecher*, 2 Wn. App. at 326. Sprecher's listing agreement with the selling broker also mentioned the land contained 30 acres more or less. Weinstein viewed the land from the road, but he did not walk the property because of the thickly wooded hillside. Four years later, Weinstein discovered that the tract contained only 24.6 acres, rather than 30. Weinstein sued and the Court of Appeals held that the doctrine of caveat emptor did not apply. Instead, Weinstein had the right to rely on the seller's representation that the tract contained "30 acres more or less," when the plot of land had no visible boundaries. The court reasoned that the boundaries were neither defined nor ascertainable without a survey. The court concluded that, under the circumstances, the buyer held no obligation to perform a survey.

In *Alexander Myers & Company v. Hopke*, 88 Wn.2d 449, 565 P.2d 80 (1977), the Supreme Court ruled that the buyer of land could justifiably rely on the purchaser's representations of acreage when the boundaries are not reasonably ascertainable and the purchaser could not have determined them without a survey.

We deem *Weinstein* and *Myers* analogous. In the two decisions, the buyer could not reasonably ascertain the boundary lines of the purchased property without a survey.

17

Allegiance contends that, if a buyer need not perform a survey in order to justifiably rely on the representations of a seller, it should be entitled to rely on a representation from the seller as to the condition of the land without performing an environmental study. Likewise, a question of fact exists as to whether Allegiance could have reasonably ascertained the presence of underground storage tanks on the Carlisle Avenue property. Although some piping may have suggested the presence of tanks, a reasonable person might conclude, based on Janet Richart's representations of the lack of tanks, that the pipes served another purpose. We do not know the steps needed to determine the presence of the tanks. Perhaps a potential buyer should dig throughout the entire property to search for hidden problems, but we leave for a trier of fact the reasonableness of such efforts.

Even if Allegiance should have known of the existence of underground storage, a question remains as to whether Allegiance should have known of the presence of contamination. Ascertaining contamination might require the hiring of an environmental specialist and significant and pricey work. A simple land survey may be easier to obtain than a Phase I environmental investigation.

We also deem *Jenness v. Moses Lake Development Co.*, 39 Wn.2d 151 (1951) apt. The buyer of a tavern, restaurant, and hotel sued to rescind the transaction on the basis that the seller misrepresented the income that the business had received. The seller argued that the buyer had no right to rely on any representations of income since the

seller made the business's accounting records available to the buyer and those records would have shown the true financial condition of the business. The Supreme Court reversed a ruling in favor of the seller and decreed rescission of the sale. Because of the positive representations of income of the business, the buyer lacked any obligation to review the accounting records made available to him. The buyer could reasonably rely on the misrepresentations, which later proved to be false.

On appeal, Janet Richart contends that Allegiance acknowledged its knowledge of the risks associated with the property in Kevin McKee's November 11, 2015 e-mail. Richart adds that Allegiance contracted for inspection rights to resolve the unknowns, which rights it failed to exercise. Finally, according to Richart, Allegiance cannot claim justifiable reliance based on the "Waiver of Inspection" provision in the inspection addendum. We disagree with each of these contentions.

In his November 11 e-mail, Kevin McKee acknowledged the possibility of underground tanks and environmental contamination. A reasonable trier of fact could conclude that the knowledge of a possibility does not preclude Allegiance from arguing it did not reasonably rely on Janet Richart's representations of the absence of tanks and contamination. To repeat, paragraph 12 of the purchase and sale agreement plainly stated:

> There are no Hazardous Substances . . . currently located in, on, or under the Property in a manner or quantity that presently violates any

> Environmental Law . . . [T]*here are no underground storage tanks located on the Property.*

CP at 22 (emphasis added).

Kevin McKee wanted additional time for Allegiance to be able to perform a study as to the underground conditions on the Carlisle Avenue property. Janet Richart refused the additional time. Allegiance then agreed to purchase the property on Richart's promise that her representations about underground storage tanks would survive closing. These additional facts could lead a trier of fact to conclude Allegiance justifiably relied on Richart's representations.

Paragraph 4, the "Waiver of Inspection" provision, does not control the parties' contractual relationship. Unlike the box next to paragraph 1 in the addendum, the parties left the box next to paragraph 4 unmarked.

Janet Richart also claims that, for purposes of Allegiance's cause of action for fraud, Allegiance provided the court no evidence conflicting with Richart's declaration that she did not know of the presence of underground storage tanks. We deem there to be a question of fact as to the lack of knowledge. We recognize that in the seller's disclosure statement, Richart proclaimed a lack of knowledge of the presence of tanks. Nevertheless, although she testified she had no memory of the visual inspection report given to her fifteen years earlier and claimed that the report only mentioned the possibility of tanks, she also specifically agreed to the lack of underground storage tanks

in the purchase and sale agreement.  A trier of fact could reasonably conclude that one does not positively represent the absence of a condition on her property unless she had knowledge of the absence, particularly in light of the earlier report.

Allegiance only assigns error to dismissal of its fraud and misrepresentation claims.  We deem intentional misrepresentation the same cause of action as fraud. Therefore, we do not address the dismissal of the breach of warranty, breach of contract, and Consumer Protection Act claims.  We reverse dismissal of the fraud and negligent misrepresentation claims on summary judgment.

## MTCA

We now address Janet Richart's cross-appeal.  Richart contends that the trial court mistakenly denied dismissal of Allegiance's MTCA claim for six reasons.  First, the court erroneously rejected her defenses of estoppel and waiver.  Second, Richart argues that Allegiance failed to present any facts showing that underground storage tank 7, the only tank suffering a leak, leaked during the time of Richart's ownership of the Carlisle Avenue property.  Third, no facts show that Richart caused a release of any hazardous substance that contributed to a threat or potential threat to human health or the environment.  Fourth, no facts show that Allegiance's investigation and remediation efforts constituted a substantial equivalent of a Department of Ecology conducted or supervised remediation.  Fifth, Allegiance failed to give public notice necessary to impose liability on another party.  Sixth, the parties made a mistake, for which Allegiance

should be responsible.  Because we agree with Richart's second contention, we do not

address her other arguments.

MTCA states that "a person may bring a private right of action, including a claim

for contribution or for declaratory relief, against any other person liable under RCW

70.105D.040 for the recovery of remedial action costs" related to contamination of

property resulting from hazardous materials, including oil.  Former RCW 70.105D.040

(2013) lists five ways a party can be liable under MTCA:

> (1) Except as provided in subsection (3) of this section, the
> following persons are liable with respect to a facility:
> *(a) The owner or operator of the facility;*
> *(b) Any person who owned or operated the facility at the time of
> disposal or release of the hazardous substances;*
> (c) Any person who owned or possessed a hazardous substance and
> who by contract, agreement, or otherwise arranged for disposal or treatment
> of the hazardous substance at the facility, or arranged with a transporter for
> transport for disposal or treatment of the hazardous substances at the
> facility, or otherwise generated hazardous wastes disposed of or treated at
> the facility;
> (d) Any person (i) who accepts or accepted any hazardous substance
> for transport to a disposal, treatment, or other facility selected by such
> person from which there is a release or a threatened release for which
> remedial action is required, unless such facility, at the time of disposal or
> treatment, could legally receive such substance; or (ii) who accepts a
> hazardous substance for transport to such a facility and has reasonable
> grounds to believe that such facility is not operated in accordance with
> chapter 70.105 RCW; and
> (e) Any person who both sells a hazardous substance and is
> responsible for written instructions for its use if (i) the substance is used
> according to the instructions and (ii) the use constitutes a release for which
> remedial action is required at the facility.

(Emphasis added). RCW 70A.305.020(22)(b), former RCW 70.105D.020, defines

"owner" for purposes of MTCA as including:

> (22) "Owner or operator" means:
> . . . .
> (b) In the case of *an abandoned facility*, any person who had owned, or operated, or exercised control over the facility any time *before its abandonment*. . . .

(Emphasis added.) Former RCW 70.105D.040 and former RCW 70.105D.020(22)(b)

repeatedly reference a "facility." Under former RCW 70.105D020(8),

> "Facility" means (a) any *building*, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, *storage container*, motor vehicle, rolling stock, vessel, or aircraft, or (b) any site or area where a hazardous substance, other than a consumer product in consumer use, has been deposited, stored, disposed of, or placed, or otherwise come to be located.

Allegiance reads the definition of "owner" under former RCW

70.105D.020(22)(b) together with former RCW 70.105D.040(1)(a) to argue that Janet

Richart faces liability because of abandonment of one or more storage tanks during

Richart's ownership. Under this theory, Allegiance need not show that any leak from

tank 7 occurred during Richart's ownership. Allegiance contends that the undisputed

facts show that all underground storage tanks were abandoned during Richart's

ownership of the property since Allegiance never used the tanks once it purchased the

Carlisle Avenue property.

23

Former RCW 70.105D.020(22)(b) mentions an owner of the facility "before its abandonment." We question the utility of Allegiance's contention because the argument assumes use of the tanks ended with its purchase of the Carlisle Avenue property. So the abandonment came at the time of the purchase, and Janet Richart never owned the tanks before the facility's abandonment.

More importantly, we disagree with Allegiance's reading of the definition of "owner of facility" when read with the definition of "facility" under former RCW 70.105D.020(8). The definition references a "storage container," but, when reading the statute as a whole, the language suggests looking at the facility as a whole if the same person owns the entire property. Otherwise, the definition of "facility" could merely reference a storage container or pipe.

In *Suddath Van Lines, Inc. v. Department of Environmental Protection*, 668 So. 2d 209, 212 (Fla. Dist. Ct. App. 1996), the Florida appellate court, when reviewing participation in the state's abandoned tank restoration program under the Florida version of MTCA, determined that the court must view the property as a whole, not the operation of one tank or storage system when deciding whether the property constituted a "facility." Allegiance cites no case law that holds a court should look to discrete tanks when determining when a facility has been abandoned.

We note that, under former RCW 70.105D.040(1)(b), Janet Richart could incur liability if the leak from tank 7 occurred during her ownership. We agree with Richart

that no facts support a conclusion that the leak occurred during her ownership. On appeal, Allegiance does not argue to the contrary.

Allegiance also contends that Janet Richart conceded, during summary judgment oral argument, that she was a potentially liable person. We recognize that counsel, during argument, inartfully commented that Richart "is a PLP [potentially liable person.]" RP at 50. We are uncertain as to the full extent that counsel intended to agree that Richart was a potentially liable party. He may have intended simply to state that, during some window of time, Richart was an owner of the Carlisle Avenue property. Nevertheless, when taken in context, we do not conclude that Richart conceded that she is liable by reason of any release occurring during her ownership or by reason of abandonment of the property or the tanks. After counsel remarked that "she's a PLP," counsel proclaimed that Janet Richart argues that no leak of contamination occurred during her ownership. RP at 50. Counsel added that Richart should be awarded summary judgment because of the lack of evidence of any leak during her tenure at the Carlisle Avenue property. Therefore, we conclude that counsel's concession does not preclude argument about the absence of evidence of a leak or absence of facts as to abandonment of the facility, an argument related to the absence of a leak.

### Attorney Fees

On appeal, Allegiance seeks recovery of its reasonable attorney fees and costs under the purchase and sale agreement and under RCW 70.105D.080, now RCW

70A.305.080, a provision of MTCA. The contract and the statute afford the prevailing party in an action recovery of reasonable attorney fees and costs. Under RAP 18.1(a), the prevailing party is entitled to attorney fees and costs on appeal if requested and if "applicable law grants to a party the right to recover reasonable attorney fees."

We are dismissing Allegiance's request for contribution or indemnification under MTCA. So Allegiance may not recover fees under MTCA. Although we have reversed summary judgment dismissal of Allegiance's claims for fraud and negligent misrepresentation, we remand for further proceedings such that Allegiance has not prevailed, at least not yet, on its claims. Therefore, we deny Allegiance an award of reasonable attorney fees and costs under contract, subject to the trial court later awarding fees incurred on appeal for the fraud and misrepresentation claims if Allegiance prevails.

Janet Richart seeks recovery of reasonable attorney fees and costs, but only under the purchase and sale agreement. Because we reverse judgment for Richart based on claims stemming from the agreement, we deny Richart recovery of fees, subject to the trial court later awarding fees incurred on appeal for the fraud and misrepresentation claims if Richart prevails.

CONCLUSIONS

We reverse summary judgment dismissal of Allegiance's causes of action for fraud and misrepresentation. We reverse the trial court's order denying Janet Richart summary judgment dismissal of Allegiance's MTCA claim and direct the trial court to dismiss the MTCA cause of action.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, C.J.

27